OPINION
{¶ 1} Defendant-appellant Terrence Brooks appeals from his conviction and sentence for robbery. Brooks contends that his conviction is against the manifest weight of the evidence because a reasonable person would not have felt threatened, and would not have been induced to part wit his or her property, under the circumstances of this case. Brooks further contends that there was n actual or potential harm to the complainant, since the gun that was allegedly used in the robbery was a toy.
 {¶ 2} We conclude that the jury did not lose its way and create a manifest miscarriage o justice. The weight of the evidence supports the jury's decision that Brooks threatened the immediate use of force against the victim while attempting or committing a theft offense. We further conclude that Brooks made an actual threat of physical harm to the victim, because Brooks led the victim to believe that he had a gun and would harm the victim if he failed to cooperate. Therefore the conviction is not against the manifest weight of the evidence.
 {¶ 3} The judgment of the trial court is Affirmed.
 I {¶ 4} In late November, 2005, eighteen-year-old Greg Steiger was working as a clerk a Omega Music. Greg's father, Gary Steiger, had owned Omega Music for 23 years. On the day i question, which was a weekday, the store was scheduled to close at 9:00 p.m.
 {¶ 5} Around 8:45 p.m., a man (later identified as Terrence Brooks), entered the store. At the time, Greg was at the front counter, and his father was in an office in the back. There was no button that would have allowed Greg to alert his father to a need for help with customers. The cash register for the store was located at the front counter, and a camera was positioned behind the cash register The camera was not operable, but was simply a dummy, intended to deter theft. *Page 3 
dummy, intended to deter theft.
 {¶ 6} When Brooks entered the store, another customer, Ryan Lamar Ward, was already present. Ward worked in Security Forces and was a member of the United States Air Force. War had also been a regular customer of Omega Music for many years. Greg and Ward were randomly talking about music and other general topics. However, when Brooks came in, Ward though Brooks's behavior was odd. As a result, Ward told Greg that he should probably go ask the customer if he needed help.
 {¶ 7} Greg did not know Brooks's name, but recognized him as someone who had been i the store before. Ironically, Greg had seen Brooks earlier the same day, at a bus stop near Omega Music. This occurred around 3:00 p.m., when Greg was reporting for his work shift at the store.
 {¶ 8} When Brooks came into the store, he went over to a display case to the right of the front door, where customers do not normally go when they enter the store. Brooks then went to the front counter to look at cell phones. Brooks asked Greg to hold a used Cricket cell phone and went back to the same display case, to look at CD-Rs. Greg tried to sell Brooks the CD-Rs, because Omega had a number of them, but Brooks declined. Greg and Brooks then walked back to the front counter, where the register was located. At this time, Brooks said, "What's up," to Ward, and War responded in kind. Ward was standing at the end of the front counter, about six feet away from the register.
 {¶ 9} Greg and Brooks began haggling over the price of the cell phone. Ward had hear people haggle over price many times, so he did not pay attention. Ward was leaning over the counter reading a magazine. In addition, music was playing, although not loudly, and a 25-inc television stood between Ward and the register. *Page 4 
 {¶ 10} The Cricket phone sold for $24 to $35. Brooks wanted a discount on the cell phone but Greg could not give it to him. Instead, Greg gave Brooks a bonus CD. Greg rang up the cell phone and put the phone and the CD in a bag. Brooks then put the bag in his coat pocket. While the register was open, Brooks said, "Screw it then. Go ahead and give me the money in the register Don't be stupid. Don't get popped." As Brooks said this, he lifted up his shirt and showed Great what looked like a Uzi, tucked in his waistband. The Uzi was grey, and Greg could see the mid-par which had lines, like ridges going down the side of the gun. Brooks's hand was covering the handle of the gun. Greg thought the gun was real, and "freaked out." Brooks spoke calmly, as if he did no want to alert Ward. While Greg was trying to get the money out of the register, Brooks told him that he was going too slow and needed to move faster. Greg thought that Brooks was going to shoot him and run if Greg made what he was doing too obvious.
 {¶ 11} Greg took between $100 and $130 in cash from the register and put it on the counter Brooks grabbed the money and left the store by backing up. Brooks then went down the street, still looking at Greg through the store windows. After Brooks left, Greg went to get his father and the told Ward the store had been robbed. Ward did not even realize a robbery had occurred until Greg told him.
 {¶ 12} The police were called at about 8:53 p.m., and arrived on the scene about four minute later. During the 911 call, Greg told the police the direction in which the suspect had gone, an indicated that there was no way he would have wanted to chase the suspect. Greg told the police the suspect had a Uzi. After the police arrived, both Greg and Ward gave descriptions of the suspect. Ward stated that the suspect was African-American, was dark-complected, was about five foot six, and wore a red athletic varsity jacket and baggy blue jeans. The suspect had on some type *Page 5 
jeans. The suspect had on some type of "do-rag" and a red baseball cap, and a braid was hanging out the back.
 {¶ 13} Greg described the suspect as having short hair and a red cap, with a red leather jacket that was kind of large. Greg later testified that the jacket could have been red with white sleeves, but he did not remember. He said he was very scared when the man showed him the gun.
 {¶ 14} The following day, at around 4:15 a.m., a police officer came across an individual (Mar Swift) who was wearing a red university jacket with white and grey sleeves. Swift's height was no right and he was not wearing a white do-rag or red baseball cap. Nonetheless, the police performed a field interview and photographed Swift. Swift's picture was later included in a photo lineup, as was the photo of another individual (Richard Russell), whose fingerprints matched one of the 24 laten prints found at the scene. Both Swift and Russell were customers of the store, and Greg told the police that neither one was the person who had robbed the store.
 {¶ 15} About a week after the robbery, Greg was riding in a car and saw Brooks at the same bus stop where he had seen Brooks before. At the time, Greg and his mother were taking his brother to work at Omega Music. Brooks was wearing the same style of hat, but it was a different color Brooks was also wearing a different jacket. After driving around to make sure it was the same person, Greg went to his father's store and told him that he had seen the robber. The police were notified and arrested Brooks shortly thereafter, near the music store. When Brooks was stopped, h told the police that they could pat him down for weapons. The patdown revealed that Brooks had plastic toy Uzi in his waistband. A socket was taped on the end of the gun, with black electrical tape However, the Uzi was green, yellow, and black, rather than grey. Brooks gave the police a false *Page 6 
yellow, and black, rather than grey. Brooks gave the police a false name and said he did no remember his social security number. Ultimately, Brooks disclosed his true identity.
 {¶ 16} After the arrest, the police matched Brooks's fingerprints with a latent print that ha been lifted from the display case where the robber had been looking at CD-Rs. Ward also selected photo of Brooks from a photo lineup, when he was asked to identify the individual who was in the store the night of the robbery. And finally, Greg identified Brooks as the robber when he testified during a preliminary hearing and at trial. Ward identified Brooks at trial as well.
 {¶ 17} Brooks was convicted by a jury of robbery and was sentenced to three years in prison Brooks then appealed from his conviction and sentence.
 II {¶ 18} Brooks's sole assignment of error is as follows:
 {¶ 19} "DEFENDANT'S ROBBERY CONVICTION WAS AGAINST THE MANIFEST WEIGH OF THE EVIDENCE."
 {¶ 20} Brooks was charged with violating R.C. 2911.02(A)(3), which provides, in pertinent par that:
 {¶ 21} "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 22} "* * *
 {¶ 23} "(3) Use or threaten the immediate use of force against another."
 {¶ 24} The requirement of using or threatening the immediate use of force against another i satisfied if "the fear of the alleged victim was of such a nature as in reason and common experience *Page 7 
common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed." State v Davis
(1983), 6 Ohio St.3d 91, 94, 451 N.E.2d 772. This is an objective, rather than a subjective test, and depends on the totality of the circumstances. State v. Habtemariam (1995), 103 Ohi App.3d 425, 429,659 N.E.2d 850.
 {¶ 25} According to Brooks, his conviction is against the manifest weight of evidence because a reasonable person would not have been induced to part with his property under the circumstance of the present case. Specifically, Brooks relies on the fact that Ward, an Air Force law enforcement officer, saw nothing more than a customer and shopkeeper haggling over a cell phone, and did no see anything unusual. Brooks claims that the store clerk, Greg, may subjectively have believed h was being threatened, but that this was simply a misconstruction of the interaction between Brook and Greg.
 {¶ 26} In considering whether a judgment is against the manifest weight of the evidence, a appellate court:
 {¶ 27} "reviewing the entire record, weighs the evidence and all reasonable inferences considers the credibility of witnesses and determines whether in resolving conflicts in the evidence the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should b exercised only in the exceptional case in which the evidence weighs heavily against the conviction. State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 28} We have stressed that factfinders should be given substantial deference in these situations, because juries or trial judges can see and hear witnesses and are in the best position t *Page 8 
best position to make credibility decisions. State v. Lawson (Aug. 22, 1997), Montgomery App. No 16288, 1997 WL 476684, *4. We have also said, however, that "the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter i which an appellate judge is at least equally qualified, by reason and experience, to venture a opinion." Id. Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, n matter how persuasive the evidence may be. Id.
 {¶ 29} In the present case, we do not need to chose among competing inferences, because there is no conflict suggested by the evidence in the record. Based on the facts, Ward's failure t observes the actual robbery is not surprising. Ward testified that he was at the end of the counter an stopped paying attention to what was happening when he heard Brooks and Greg begin to haggle over the price of a cell phone. Ward became involved in reading and stated that his head was down looking at a magazine. A television set also partially blocked Ward's view, and music was playing Furthermore, Brooks spoke calmly (perhaps in an effort to avoid alerting Ward) and lifted his shirt t show Greg that he had a gun.
 {¶ 30} The only actual witness to the crime was Greg, who testified that he was very frightened, and thought Brooks was going to shoot him if he did not comply with the demand to turn over the money in the register. The jury clearly believed Greg's testimony, and was justified i finding that Greg's fear reasonably induced him to part with the store's property against his will.
 {¶ 31} Brooks also contends that we have previously limited the definition of force by holding that the type of force must pose actual or potential harm to a person. According to Brooks, no actual *Page 9 
Brooks, no actual or potential harm could have been caused to Greg, because the weapon that Brooks allegedly carried was a toy gun. The case Brooks relies on for this proposition is State v Furlow (1992),80 Ohio App.3d 146, 608 N.E.2d 1112. In Furlow, we did say that "the difference between theft and robbery is an element of actual or potential harm to persons." 80 Ohio App.3d a 148. However, Furlow involved facts quite different from those in the present case.
 {¶ 32} In Furlow, the defendant asked the victim for change for a five dollar bill. The defendant then fled after snatching a wallet and five single dollar bills from the victim's hands. Id. a 149. The element of "force" was that the defendant snatched these items from the victim's "firme than usual grip," which occurred after the victim became aware of the defendant's intent. At that point, the victim tried to hold on to the wallet and bills more firmly, but the defendant pulled them out and ran away. We concluded this was insufficient force to support a robbery conviction because the force did not pose actual or potential harm to the victim. Id.
 {¶ 33} We subsequently explained our reasoning, by stating that:
 {¶ 34} "The distinction between theft and robbery we found inFurlow finds support in common law. Robbery is a form of theft, an unlawful taking of the property of another. In former times frequently was accomplished by some `strong-arm' method that resulted in harm to the victim o threatened the victim with harm. Thus, to constitute robbery, the unlawful taking was (1) of the victim's property from the victim's person or the area of the victim's personal control, (2 accomplished by force or violence that harmed the victim or the threat of it that put the victim in fear of such harm. The harm or threat of harm might be inflicted to accomplish the theft or to ward off the victim's natural attempts to resist or to stop the criminal in a flight from the crime. This same *Page 10 
the criminal in a flight from the crime. This same component of actual or potential physical harm i reflected in the statutory definition of `force,' which contemplates more than a mere touching; requires the application of `violence' or of physical `compulsion' or `constraint' to accomplish the theft. The Committee Comment to R.C. 2911.02(A) we cited in Furlow articulates and perpetuate this distinction in the case of the offense of Robbery by requiring evidence of actual or potential physical harm." State v. Weaver (Nov. 1, 1993), Champaign App. No. 93 CA 02,1993 WL 441799 *2.
 {¶ 35} Accordingly, in Weaver, we found the evidence insufficient to establish that the victim suffered actual or potential physical harm when the defendant simply came up from behind a victim yanked her purse off her shoulder, and ran away. Id. at *3.
 {¶ 36} In State v. Taylor (July 3, 1997), Montgomery App. No. 16115,1997 WL 368360, w interpreted a similar argument on force as one about sufficiency of the evidence, rather than manifest weight, because "`sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented." Id. at *5. The defendant in Taylor was convicted of robbery which required the use of force or attempted force. We noted that force was defined by R.C 2901.01(A) as "`any violence, compulsion, or constraint physically exerted by any means upon o against a person or thing.'" Id. at *6.
 {¶ 37} The defendant in Taylor had grabbed a victim by the hand and wallet, and the victim was unable to let go of the wallet as the defendant tugged at it. Again, this was like the simple "touching" that we rejected in Furlow. Had these been the only facts in the case, we would have been required to find, as we did in Furlow, that the necessary physical harm or threat of harm wa absent. However, the defendant also told the victim "to shut up or he would `knock [her] upside the *Page 11 
would `knock [her] upside the head and slit [her] throat.'" Id. (Bracketed material in original.) Under these circumstances, we concluded that the jury could have found the essential element of force for robbery proven beyond a reasonable doubt. Id. We also rejected a manifest weight challenge because the record contained evidence that, if believed, would persuade the average mind beyond reasonable doubt that the defendant was guilty of robbery. Id.
 {¶ 38} The same reasoning applies in the present case. The State did not have to prove that Brooks physically harmed Greg. Instead, the State needed only to prove a "threat of immediate force." The fact that the gun was apparently a toy does not mean that there was no threat o violence or constraint used to accomplish the theft. As we noted, Brooks told Greg, "Go ahead an give me the money in the register. Don't be stupid. Don't get popped." When Brooks said this, h lifted up his shirt and had his hand on what appeared to be a gun. These facts constitute a threat o immediate force, whether the gun was real or not.
 {¶ 39} In State v. Knight, Greene App. No. 2003 CA 14, 2004-Ohio-1941, we found the evidence legally sufficient to sustain a conviction for aggravated robbery (which requires proof o possession of a deadly weapon), where a store clerk testified that the defendant approached her wit his hands in his pockets and looked like he had a small gun in his pocket. The clerk never saw weapon, but opened the register because she believed the defendant was armed with a gun. Id. a TJ20-29. Similarly, in State v. Yopp, Ashtabula App. No. 2005-A-0001, 2006-Ohio-1682, the Eleventh District Court of Appeals found that a defendant's conviction for aggravated robbery was not against the manifest weight of the evidence, where the defendant pointed what appeared to be a handgun a the victim and threatened her. However, the gun was not a real weapon, but was only a toy. Id. a *Page 12 
threatened her. However, the gun was not a real weapon, but was only a toy. Id. at ¶ 26-27.
 {¶ 40} The defendant in Yopp was convicted of aggravated robbery and theft. In finding that prison term was warranted for the theft offense, the Eleventh District agreed with the trial court that the defendant made an "actual threat of physical harm to the victim" because he threatened physical harm to the victim when he led her to believe he had a gun and when he warned that no one would be hurt if the victims cooperated. Id. at ¶ 45.
 {¶ 41} In the present case, the robbery was "accomplished by force or violence that harmer the victim or the threat of it that put the victim in fear of such harm." Weaver, 1993 WL 441799, a *2. The harm or threat of harm was inflicted to accomplish the theft or to warn off Greg Steiger' natural attempts to resist. Id. Accordingly, the fact that the gun was a toy is irrelevant.
 {¶ 42} Based on the preceding discussion, Brooks's sole assignment of error is overruled.
 III {¶ 43} Brook's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
 BROGAN and GRADY, JJ., concur. *Page 1