[Cite as *State v. Hammond*, 2013-Ohio-2466.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 99074

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CURTIS HAMMOND

DEFENDANT-APPELLANT

---

## JUDGMENT:
## CONVICTION MODIFIED; REMANDED FOR RESENTENCING

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-560480

**BEFORE:** McCormack, J., Celebrezze, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** June 13, 2013

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

By: Erika B. Cunliffe
Cullen Sweeney
Assistant Public Defenders
310 Lakeside Avenue, Suite 200
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: John F. Hirschauer
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, OH 44113

TIM McCORMACK, J.:

{¶1}   Curtis Hammond appeals from a judgment of the Cuyahoga County Court of Common Pleas that found him guilty of aggravated robbery and disrupting public services, and sentenced him to three and one-half years of imprisonment for his convictions.   Having reviewed the record and applicable law, we conclude Hammond should have been convicted of robbery rather than aggravated robbery, because the state presented no evidence that the toy gun used in the incident is a "deadly weapon" as statutorily defined.   We affirm his conviction of disrupting public services but modify his conviction of aggravated robbery to robbery and remand the matter for resentencing.

## Substantive Facts and Procedural History

{¶2}   Hammond was charged with aggravated robbery in violation of R.C. 2911.01(A)(1) and disrupting public services in violation of R.C. 2929.04(A)(1), after he allegedly held up an acquaintance with a toy gun and ripped a telephone jack from the wall.   After a bench trial, he was found guilty of both offenses and sentenced to three years of imprisonment for aggravated robbery and six months for disrupting public services, to run consecutively.

{¶3}   Johnnie S. Patrick, III, and Hammond both resided at a CMHA senior apartment complex located on East 93rd Street in Cleveland.   Patrick has been a resident there for several years; Hammond moved in in January 2012.   They struck up a friendship.   Hammond, who was in his early 50's, would periodically check on Patrick,

in his 70's.   On March 3, 2012, Hammond gave Patrick a haircut and trimmed his beard.   Afterwards, the two went to the store together.   Patrick bought some Polish boys and alcohol for the two of them, paying with cash from his billfold.   The two then went back to Patrick's apartment.   CMHA surveillance cameras showed they exited the apartment building at 1:36 p.m. and re-entered the building at 1:48 p.m., with Hammond carrying a bag.   They entered the elevator at 1:49 p.m.

{¶4}   After they returned to Patrick's apartment, they ate the Polish boys and drank the alcohol, but Patrick and Hammond gave conflicting accounts as to what else transpired in the apartment.   Patrick alleged Hammond robbed him; Hammond denied it.

{¶5}   Patrick testified that, at one point, he went to use the toilet and, when he came out, he sat down on his bed.   Hammond pretended to tie his shoelaces, but unexpectedly tackled him.   While they were "tussling" and "wrestling," Hammond reached for Patrick's pocket, where he kept his billfold.   In the midst of the struggle, Hammond pulled out a gun.   Believing Hammond would have hurt him with the gun, Patrick threw his hands up and gave up the struggle.   Hammond took Patrick's billfold and then ripped the telephone off the wall before he ran out of the apartment.   Patrick went downstairs to call the police at around 3:00 p.m.   His billfold was later recovered from behind his bed.   Patrick testified that he wears eyeglasses and also a patch over one eye, but he can see out of his good eye.

{¶6}   Hammond testified that Patrick was like a father to him and he would check on Patrick often.   He denied robbing Patrick after they returned to his apartment.   He

stated he left the apartment that day to go to a baby shower at around 3:00 p.m. or 3:15 p.m., with $10 Patrick had given him for the bus fare.

{¶7} Hammond also testified that the toy gun retrieved from the apartment actually belonged to Patrick, who had shown him the gun the day before, and asked him to buy a real gun that would resemble the toy gun. Hammond told Patrick he was not going to buy a gun for him because both of them are ex-felons. Instead, he used the $200 Patrick gave him to purchase the gun to buy wine, liquor, and cigarettes for the two of them. He stated Patrick was angry with him for not purchasing a gun for him.

{¶8} Detective Ovalle, a CMHA police officer, received a call at about 3:00 p.m. on the day of the incident for an armed robbery at Patrick's apartment. Patrick, shaken and disheveled, told the officer he was robbed by a tall, black man named "Curtis." His bedroom was in disarray — the mattress was on the floor, as well as clothing and other items, suggesting there had been some type of struggle. Food and alcoholic beverages were also scattered around. Patrick told the officer that Hammond pulled out a black pistol and demanded money from him, after he lost his eye glasses and eye patch during a struggle. Detective Ovalle found the eyeglasses and eye patch behind the bed, as well as a black plastic toy pistol. After Patrick put his glasses on, he took a good look at the toy gun and identified it as the weapon pulled by Hammond. Detective Ovalle also observed the phone jack broken off the wall. Patrick did not sustain visible injuries.

{¶9} Patrick reported the incident to the apartment manager, Diane Tirado. Tirado testified that Patrick told her he and Hammond went to Double Exposure to get

something to eat and drink.   When he opened his wallet to pay, Hammond saw the large amount of cash that Patrick had taken out of the bank earlier.   While back in Patrick's apartment, Hammond started pushing him around, knocking his eye patch off, and then held him up and robbed him.     When she checked his bedroom, the mattress was off the bed frame and the telephone jack was ripped from the wall.

{¶10} On appeal, Hammond appeals his convictions of aggravated robbery and disrupting public services, and also the consecutive sentences imposed by the trial court for his convictions.

## Sufficiency of the Evidence

{¶11} Under his first assignment of error, Hammond claims his conviction of aggravated robbery is not supported by sufficient evidence.[1]

{¶12} When reviewing a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.   *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

---

[1] Based on the witnesses' testimony that a phone jack was ripped off the wall, Hammond was also convicted of disrupting public services in violation of R.C. 2929.04(A)(1), which prohibits a person, by damaging or tampering with any property, from interrupting or impairing television, radio, telephone, telegraph, or other mass communications service.   Hammond does not challenge the sufficiency of the evidence regarding his conviction of this offense.

elements of the crime proven beyond a reasonable doubt." *Id.* A sufficiency challenge requires us to review the record to determine whether the state presented evidence on each of the elements of the offense. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541.

{¶13} Hammond was convicted of aggravated robbery, which is defined in R.C. 2911.01(A)(1). That statute states, in pertinent part:

> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * *.

{¶14} Hammond argues the evidence was insufficient to convict him of aggravated robbery. Specifically, he contends the state failed to present sufficient evidence showing the gun used in the robbery incident was a "deadly weapon."

{¶15} R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

### Whether the Toy Gun was a Deadly Weapon

{¶16} We begin with the recognition that "[a]n item does not have to be one that kills in order to be a deadly weapon. No item, no matter how small or commonplace,

can be safely disregarded for its capacity to cause death when it is wielded with the requisite intent and force." *In re Smith*, 142 Ohio App.3d 16, 24, 753 N.E.2d 930 (8th Dist. 2001), citing *State v. Deboe*, 62 Ohio App.2d 192, 193-194, 406 N.E.2d 536 (6th Dist.1977). However, the courts have provided guidance regarding when a device such as a toy gun or BB gun can be considered a deadly weapon.

{¶17} In *State v. Hicks*, 14 Ohio App.3d 25, 26, 469 N.E.2d 992 (8th Dist.1984), this court considered the issue of whether the toy gun used during an attempted robbery was a deadly weapon. We observed that the courts have previously found inoperable guns, starter pistols, and inoperative BB and pellet guns "capable of inflicting death" because of their possible use as bludgeons. In *Hicks*, the arresting officer testified that the toy gun used in the incident was metal, similar to a .25 caliber handgun, and that the police had investigated crimes where such objects had been used as bludgeons. Based on the testimony and our own examination of the toy gun, which had been submitted as an exhibit, this court in *Hicks* concluded the conviction of aggravated robbery was supported by sufficient evidence.

{¶18} In *State v. Brown*, 101 Ohio App.3d 784, 656 N.E.2d 741 (1st Dist.1995), the defendant used a BB gun to assault the victim, and the First District applied *Hicks* to resolve the question of whether the defendant should have been convicted of felonious assault, an issue that similarly turned on whether the BB gun used by the defendant was a deadly weapon "capable of inflicting death." The First District reversed the defendant's

conviction for felonious assault after determining the state failed to prove the BB gun used by the defendant had been "capable of inflicting death."

{¶19} The First District explained that the law in Ohio was fairly well settled: "a BB gun *may* be a deadly weapon if *capable of inflicting death*, as a bludgeon, or perhaps as used in some other manner (one could envision a BB gun so powerful that it could be a deadly weapon by its very nature)." (Emphasis sic.) *Id.* at 788. "This capability, however, is a factual issue to be determined by the trier of fact." (Citation omitted.) *Id.* The First District noted that in *Hicks,* this court based its conclusion that the toy gun in that case was in fact a deadly weapon on the arresting officer's testimony that the toy gun was made of metal and that the police had investigated crimes where such objects had been used as bludgeons, as well as its own examination of the toy gun. *Id.*

{¶20} The First District explained that, in contrast to *Hicks*, there was no evidence that the *Brown* defendant ever used or threatened to use the BB gun as a bludgeon, nor could any inference of such use be made from the evidence. The BB gun was not introduced in evidence, and the only description of it was that it was long and had a pump. Although the victim in *Brown* was struck with BBs, there was absolutely no evidence adduced concerning the particular BB gun's capability of inflicting death, either as a bludgeon or otherwise. The First District emphasized that a BB gun was not a deadly weapon as a matter of law, concluding that, "in the absence of more evidence about the quality and characteristics of the BB gun used in the offense, identifying it as

capable of inflicting death," the defendant should have been convicted only of simple assault.

**{¶21}** In *State v. Gray*, 1st Dist. No. C-081257, 2009-Ohio-5844, the court reached a similar conclusion that there was insufficient evidence to support the jury's finding that the defendant's BB gun was a "deadly weapon" under R.C. 2923.11(A). The court reasoned that there was no evidence demonstrating how the defendant's particular BB gun was capable of inflicting death; there was also no testimony tying the particular attributes of the gun to its potential capacity for inflicting death — for example, evidence showing the particular BB gun was heavy enough to be used as a deadly bludgeon. The court, in addition, remarked that the deadliness of certain types of BB guns, in general, should not have been admitted into evidence because it was irrelevant to the issue whether the defendant's BB gun was a deadly weapon.

**{¶22}** In *State v. White*, 8th Dist. No. 92972, 2010-Ohio-2342, another BB gun case, this court reached a different result, based on the evidence presented at trial. We reasoned that the trier of fact heard testimony that the gun was made of "hard" plastic; in addition, pictures of the gun recovered on the scene showed a warning engraved on the gun stating: "Not a toy. Misuse may cause fatal injury." We also pointed out that the pistol-whipping the victim received had caused bleeding and swelling on his face. If the gun could open cuts and bruise the face, the trier of fact could rationally have concluded that this evidence was sufficient to demonstrate the bludgeoning power of the BB gun, thereby confirming that the BB gun could be used as a deadly weapon.

**{¶23}** Based on the case law, therefore, in order to support a conviction of aggravated robbery, the state must present evidence to show the toy gun retrieved from the victim's apartment, which the state alleged to be the gun used in the robbery incident, was a deadly weapon capable of inflicting death. However, there was no evidence, testimonial or otherwise, presented at trial to show this toy gun was heavy enough to be used as a deadly bludgeon, or capable of inflicting death in other manners. Our own examination of the toy gun shows it is made of light plastic, weighs 1.5 ounces and measures 5 inches in length and 3.5 inches in height; clearly not a device that was proven in any manner capable of inflicting death. Unlike in *White*, where evidence was presented regarding the attributes of the BB gun demonstrating it was capable of inflicting death, no such evidence was presented here.

### The State's Reliance on *State v. Smith* is Misplaced

**{¶24}** The state claims a prior decision from this court, *State v. Smith*, 8th Dist. No. 94167, 2011-Ohio-306, supports its contention that a toy gun could be a deadly weapon if it caused such fear that a victim was induced to part with his or her property.

**{¶25}** In *Smith*, the victim testified that appellant threatened him with a gun. When appellant was apprehended in his vehicle moments after the robbery, a .357 Magnum revolver was found in the vehicle's glove compartment; however, the police also found a toy plastic gun in the trunk of the car. In challenging the victim's credibility, appellant argued that the victim could not identify the gun pointed at him, leaving the possibility that the gun used in the robbery may have been the toy gun. A

panel of this court affirmed appellant's aggravated robbery conviction, deferring to the trier of fact for its evaluation of the victim's testimony about the gun.   *Id.* at ¶ 26.

**{¶26}** In its analysis, however, the panel mentioned in passing that whether a real gun or a toy gun was used to commit the robbery was not dispositive, because whether the real gun or the toy gun was pointed at the victim, the fear of the victim was such that the victim was induced to part with his property.   The panel cited *State v. Brooks*, 2d Dist. No. 21531, 2007-Ohio-1029, for the statement.     *Brooks* is not pertinent authority in an aggravated robbery case, because the *Brooks* defendant was charged with *simple robbery* in violation of   R.C. 2911.02(A)(3), which prohibits a person to "[u]se or threaten the immediate use of force against another."   The court in *Brooks* explained that the requirement of using or threatening the immediate use of force against another would be satisfied if "the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will * * *."   *Id*. at ¶ 24, citing *State v. Davis*, 6 Ohio St.3d 91, 94, 451 N.E.2d 772 (1983).     Unlike simple robbery, a conviction of aggravated robbery requires the use of a device capable of inflicting death.   It does not depend on what the victim perceives.

**{¶27}** The state's reliance on *Smith* is misplaced.   In that case, the victim's testimony about having a gun pointed at him was corroborated by the discovery of a real gun in the glove compartment of the defendant's vehicle moments after the robbery. The fact that a toy gun was also found in the trunk was tangential to the case.   The *Smith*

panel never stated the toy gun could be a deadly weapon supporting an aggravated robbery conviction if it induced fear by the victim.

## The State's Argument on Appeal

{¶28} On appeal, the state argues, for the first time, that the toy gun retrieved in the victim's apartment was *not* the weapon used in the offense. The state makes this argument even though in both its opening and closing argument, it alleged the toy gun retrieved was the weapon used by Hammond and it submitted the gun as the state's exhibit No. 1. The state now refers us to page 35 of the trial transcript, where Patrick was asked if the toy gun recovered by the police was the weapon used in the robbery and he answered it "[l]ook[s] like it." Citing this testimony, the state claims Patrick did not really identify the toy gun as the weapon used in the offense and invites us to entertain the possibility that a *different* gun, presumably a real gun, could have been used in Hammond's commission of robbery.

{¶29} First of all, the claim that Patrick was unable to identify the toy gun as the weapon used in the robbery is belied by our own review of the trial transcript, which reflects Detective Ovalle's testimony on two occasions at trial that, during his investigation, Patrick identified the toy gun as the one Hammond pulled during the incident.

{¶30} Second, the state raises this claim on appeal even though at trial it never presented this alternative theory. The state submitted no evidence whatsoever regarding the possible existence of a separate "real" gun.

{¶31} In the absence of any evidence, the state asks us to consider the possibility that a real gun, not the toy gun retrieved from the scene, had been used in the robbery. The state is essentially claiming that the victim's testimony that *a gun* was used in the robbery, *alone,* constituted sufficient evidence for the existence of a real gun, which *is* a deadly weapon, to support an aggravated robbery conviction.

{¶32} While the state presented evidence regarding the *toy gun* — the victim testified he was threatened with a gun; a toy gun was retrieved from the scene and identified by the victim to the police as the weapon used. The toy gun was submitted as a trial exhibit. There was no evidence introduced in this case at all regarding the use of a *real* gun by Hammond during the robbery incident, other than the state's conjecture in its brief on appeal.

{¶33} Based on the foregoing analysis, we conclude that there is insufficient evidence to establish the use of a "deadly weapon," an essential element for the offense of aggravated robbery.

{¶34} The state, in its closing argument, requested that the trial court consider, as an alternative to aggravated robbery, a reduced charge of simple robbery. Simple robbery is defined in R.C. 2911.02(A)(2). The simple robbery statute does not require proof of the use of a "deadly weapon," but only requires the proof that the defendant did "inflict, attempt to inflict, or threaten to inflict physical harm on another." The state argued the element of "threaten[ing] to inflict physical harm" was satisfied by

Hammond's brandishing the gun and pointing it at the victim, causing the victim to give up the struggle and to give up his property.

{¶35} Having reviewed the evidence contained in the record, we conclude there is sufficient evidence supporting a conviction of robbery as defined in R.C. 2911.02(A)(2). The first assignment of error is sustained in part.

## Manifest Weight

{¶36} Under the second assignment of error, Hammond claims his convictions for aggravated robbery and disrupting public services are against the manifest weight of the evidence. Having concluded the evidence on the record is sufficient to support a conviction of robbery as defined in R.C. 2911.02(A)(2), we now review the record to determine whether a conviction of robbery is against the manifest weight of the evidence.

{¶37} Unlike sufficiency of the evidence, manifest weight of the evidence raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins*, 78 Ohio St.3d at 387, 1997-Ohio-52, 678 N.E.2d 511, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983)

**{¶38}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. No. 98538, 2013-Ohio-1184, ¶ 18.

**{¶39}** Under this assignment of error, Hammond primarily challenges the victim's credibility, pointing out certain details of his testimony that were inconsistent — for example, he was inconsistent regarding the amount of money stolen and the time of the robbery.

**{¶40}** The weight to be given the evidence and the credibility of the witnesses is for the trier of fact — in this case, the trial judge, who had an opportunity to view the victim and observe his demeanor in weighing his credibility. The trial court was aware of the slight inconsistences in the victim's recounting of the incident.

**{¶41}** We note that the victim's account of being robbed by Hammond — giving up the struggle after Hammond pulled the gun because he believed Hammond may hurt him with the gun — was largely corroborated by the investigating officer and the apartment manager. The officer found the victim's bedroom in a state of disarray indicative of a struggle. He also found the victim's eyeglasses and a toy gun behind the

bed. This corroborates what the victim had told the apartment manager — that Hammond pushed him around, knocking his eyeglasses off his face, and then pulled a gun and robbed him. Therefore, the weight of the evidence supports a finding that Hammond is guilty of robbery as defined in R.C. 2911.02(A)(2), i.e., while committing theft, he inflicted, attempted to inflict, or threatened to inflict physical harm on the victim.

{¶42} Regarding the conviction of disrupting public services, both the investigating officer and the apartment manager saw the telephone jack to have been ripped off the wall, supporting the victim's testimony that Hammond pulled the telephone after robbing him.

{¶43} Having reviewed the trial transcript, we cannot say this is one of the exceptional cases where the evidence weighs heavily against the conviction, which would warrant an exercise of our discretionary power to grant a new trial. The second assignment of error is overruled to the extent that manifest weight of the evidence supports Hammond's convictions for robbery as defined in R.C. 2911.02(A)(2) and disrupting public services.

{¶44} Finally, under the third assignment of error, Hammond claims the trial court erred in imposing consecutive sentences for his offenses without making the requisite statutory findings on the record. The state concedes the error. This issue is moot, however, because the matter is remanded to the trial court for resentencing. The trial court is to resentence Hammond based on the reduced conviction and to determine

whether the sentences for the offense of robbery and disrupting public services are to be served consecutively.

{¶45} The trial court's judgment is modified to reduce the conviction from an aggravated robbery to robbery as defined in R.C. 2911.02(A)(2), and the matter is remanded for sentencing consistent with the conviction as modified.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
PATRICIA ANN BLACKMON, J., CONCUR