[Cite as *State v. Putman-Albright*, 2016-Ohio-319.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NOS.   26679 and 26685 |
| | : | |
| v. | : | T.C. NOS. CRB1402809 and |
| | : | CRB1402810 |
| TINA M. PUTMAN-ALBRIGHT | : | |
| | : | (Criminal appeal from |
| Defendant-Appellant | : |  Municipal Court) |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___29th___ day of ____January____, 2016.

. . . . . . . . . .

JOE CLOUD, Atty, Reg. No. 0040301, Vandalia Municipal Court Prosecutor's Office, 3973 Dayton-Xenia Road, Beavercreek, Ohio 45432
        Attorney for Plaintiff-Appellee

MITCHELL J. FROST, Atty. Reg. No. 0091185, P. O. Box 504, Xenia, Ohio 45385
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1}  This matter is before the Court on the Notices of Appeal of Tina M. Putman-Albright, filed May 4, 2015.  Tina appeals from two judgment entries of conviction in Vandalia Municipal Court, following a bench trial, at the conclusion of which Tina was found guilty of twice violating a protection order obtained by Donald Albright, Tina's ex-

husband and the father of her son, in violation of R.C. 2919.27, misdemeanors of the first degree. Tina was sentenced to one hundred and eighty days in jail on each count with all but three days suspended, as well as a year of probation, on each charge. She was further ordered to serve 15 hours of community service on each charge for a total of thirty hours. We hereby affirm the judgment of the trial court.

{¶ 2} Tina was charged with violating the protection order on October 21, 2014, as well as on October 29, 2014. The complaint stemming from the October 21, 2014 offense alleges in part that Tina violated the protection order "by driving her vehicle behind [Donald] following him home." The second complaint alleges in part that Tina violated the protection order by "being within 500 feet of Donald Albright and speaking to him other than parental concerns." (sic). Both complaints provide that Tina recklessly violated the terms of a protection order issued, or consent agreement approved pursuant to R.C. 2919.26 or 3113.31, citing "10 DV 602 issued by Domestic Relations Court." Tina entered pleas of not guilty on December 5, 2014, and the trial was held on March 23, 2015.

{¶ 3} Donald testified that his and Tina's seven year old son resides with him, and that on the morning of October 21, 2014, at around 6:20 in the morning, he walked the child to the bus stop for school. Donald stated that the bus stop is "one street over from where we live," in Harrison Township. Donald stated that he and Tina each have protection orders against each other, and that his, which he identified, is dated May 27, 2010, and remains in effect for five years. According to Donald, he and Tina are allowed to communicate regarding their son on a limited basis, but Tina must remain 500 feet away from him. Donald stated, "I mainly communicate for a matter of record text

messages."

**{¶ 4}** Donald stated that he was off work on the morning of October 21, 2014, and that he carried a flashlight to the bus stop since it was dark out at that time of morning, and since "we got like raccoons and stuff like that living by us." Donald stated that he observed Tina in her car with her lights flashing at the bus stop, and that he let their son call her "just so she can talk to him while we was on our way down there and also to let her know that we were on our way down there and for her to leave because of the restraining order." According to Donald, Tina is "not supposed to be down there period. Her visitation is on Wednesday's (sic) where she is allowed to pick him up from school and she has an overnight visitation where in our Divorce Decree she must take him back to school on time on Thursday."

**{¶ 5}** Donald testified that the bus pulled away before he and his son reached it, and that Tina "made a phone call, told us that we had missed the bus and that I had to take him to school on time, he better make it on time, all this other mess that she was talking." Donald testified that "it was absolutely no problem because * * * it was still early in the morning, he missed his bus, fine, but I have a working vehicle, so, and the school doesn't start to (sic) like 8:00 or so." The following exchange occurred:

> Q. Okay, so she calls you, then what do you do, do you turn around and go home?

> A. Well yes, because we just made it to the end of our block, yes, I, I know. * * * We turned around and we was going back to the end of our, was walking up our street. Our street is a one way street where you have to come down one side, come up one side and go down the next side,

because in the middle of the street it's a (unintelligible), so it's just one way up, one way back and no matter how you go you have to go around the block to pass our house. * * * She came up the wrong side of the street behind us in her car as we was walking back up towards the street . . .

Q. You and your son?

A. Me and my son, 'cuz we didn't drive 'cuz it's just so close to our house, but she came up the wrong side of the street and may be have been as close from where I'm sitting maybe to that wall with her headlights on, got out of the car, and mind you, I have neighbors, but the police been over to my house so many times they just automatically know. The neighbors automatically know that, and then she got out of her car and just started yelling about how I missed the bus, how he's gonna get to school, just everything that you already knew, you know, was gonna happen. I knew that I was gonna take him to school. Okay, I missed the bus, it's no big deal, people miss the bus, but I had a working car. So what's the big hoopla that, absolutely nothing, but still the fact that she came up the wrong side of the street, followed me in her car. I mean you don't know what she's gonna do. You * * * have no idea what somebody's gonna do at night or in the morning, which is like at night, in a car.

Q. Did she eventually get back in the car and leave?

A. She got back in the car because * * * as she was yelling I was saying I was gonna call the police. It was just the last straw of a lot of things that was happening. * * *

Q.  So then October 29, eight days later, something similar happens?

A.  Did the exact same thing.

Q.  So can you describe that again?

A.  So this time as, again we was walking down there, we did not miss the bus this time.  So we were walking down there towards the bus stop and we noticed that Tina's car was down there again in the same spot with the lights, with the emergency lights blinking waiting for us to come and she called, either she called or I called them, can't remember which, * * * I think I called her because our son wanted to speak to her.   * * * I got on the phone and I said, okay, we are on our way, you need to leave.  I'm not leaving, send my son down to me.   I said, no, I'm not gonna send your son down to you, A, it wasn't her day, but I said, nope, I'm not gonna send your, our son down to you, you need to leave so that we can get to a bus stop on time before the bus came.   * * *

Q.  How close were you . . .

A.  We were one block away.  We were, we were one block away so I would guess it to be less than five hundred feet, but exactly one block away, one block away where she could see us coming without getting out of her car.

{¶ 6} Donald testified that when he refused to send the child to Tina, "* * * she said, what's the matter you punk ass, are you afraid of my brother, and then that's when I said, no, I'm not afraid of your brother. * * *."   Donald stated that he called the Sheriff's

Department and that at that point, Tina left. He stated that he advised "dispatch exactly what type of car she was in" and "where she was heading so that they can truly catch her."

{¶ 7} On cross-examination, the following exchange occurred:

Q. Mr. Albright, on, it's my understanding that, is this correct, that one of the parents needs to be with the child at the bus stop until the bus comes?

A. That is not correct.

Q. * * * Has it been your policy though that one of you is with your son at the bus stop every morning?

A. It hasn't been our policy. This is the first time this year, that's the first time that he has ever taken a bus to school.

Q. Right.

A. So last year he didn't * * * take the bus to school, but this year, at [. . . school], is the first time that I actually enrolled him to get on the school bus.

Q. Right, but isn't there a policy that one of the parents is supposed to be with the child at the bus stop?

A. No, it's not. The policy is for a child that's in kindergarten, and I think it's just kindergarten . . .

Q. Uh hum.

A. You can look that up on the line.

Q. Okay, well, have you and Tina generally made it a practice that

one of you would be with your son at the bus stop?

A.   No, because from my testimony earlier I do not talk to Tina that way.   We have a restraining order about that.   Even though we can talk about the child. . .

Q. Uh hum.

A.   . . . we've never discussed that at all, whether I or Tina should be at that bus stop * * * we've never discussed that.

{¶ 8} Donald testified that after the last incident, he asked his son's after-school caregiver, who is his neighbor, to take the child to the bus stop in the mornings, and that she agreed to do so. Donald stated that the only time that Tina could take their son to the bus stop would be the Thursday morning after her Wednesday night visitation, because on the other weekday mornings the child is with him.   Regarding the morning of the first incident, Donald testified that he did not observe Tina's brother in the car, and that Tina "told me that there was someone in the car but I remember in my report saying it was dark," and that "I couldn't verify whether or not somebody else was sitting in the passenger seat or not * * *."   Donald stated that on that date, Tina "was right where the bus comes at which is at the corner of Daleview and Castlewood."   Donald stated in the course of both incidents, he "was at the corner of Springbrook and Daleview, I would not get any closer * * * than that because we could see Tina (sic) car right there."   He stated that "[b]oth days Tina was within five hundred feet of me, so that is undeniable there."

{¶ 9} On re-direct examination, Donald testified that Tina lives in Trotwood, "so that's a distance to come from Trotwood over to my house."   Donald testified that he wrote in his statement to the police that when Tina got out of her vehicle and yelled at

him, she was thirty feet from him and the child. Donald's amended restraining order was admitted into evidence.

{¶ 10} Tina testified that in August, 2014, her son was left alone at the bus stop when he was seven years old, and that "it was very dangerous outside and very dark." According to Tina, "both of our attorneys agreed that one of the parents have to be there at the bus stop." Tina testified that on the morning of October 21, 2014, Donald called her and advised her that "he's not gonna be at the bus stop and our agreement is that when he's not at the bus stop I would be there at the bus stop. This had been going on every (sic) since the beginning when [the child] was left by himself at the bus stop." Tina testified that she has "been at the bus stop August, September and October," and that she "was there every day, Monday through Friday." Tina testified that her brother accompanied her to the bus stop on October 21, 2014. Tina stated that as she waited at the bus stop "at Castlewood and Daleview," she observed Donald and her son "in my rearview mirror so they were very, very far away." Tina stated that Donald "was yelling in the middle of the street" * * * "saying that he doesn't need me now at the bus stop," and that she accordingly drove away.

{¶ 11} On October 29, 2014, Tina testified that "that was a Wednesday, Donald called me and said once again he was not gonna be at the bus stop, 'cuz that's our normal routine that we would do." She stated that she went to the bus stop that day with her brother. According to Tina, after they arrived, her brother got out of the car to smoke a cigarette while they waited for her son. She stated that she observed Donald and her son turn onto Daleview from Springbrook, " 'cuz like when they turn it's a long street but you can see them." Tina stated that Donald observed her brother and "yelled, who is

that," and that she "was just like this is my brother." Tina stated that she "said just have [the child] come on down," and that Donald refused to do so. According to Tina, the bus arrived, "and the bus driver's like, where's your son, 'cuz he know I'm always there with my son at the bus stop." When asked if she could still see Donald and her son after speaking to the bus driver, Tina replied, "[n]o, I don't know where they went to." She stated that she "just drove off."

{¶ 12} On cross-examination, Tina stated that she was at the bus stop every school day between October 21 and 29, 2014. Tina denied being within five hundred feet of Donald at the bus stop, and she stated, "I don't ever go near Donald. I'm with Artemis, they teach us how to be safe." Tina testified that she has not been to the bus stop since October 29, 2014.

{¶ 13} The trial court ruled from the bench as follows:

* * * You know, I have to tell you, Ms. Putman-Albright, the complaining witness is very credible. This, what you're telling us just doesn't make any sense. Your testimony just, you know, it's obviously going to self-serving (sic), but in this case the details to which the victim explained how you followed him and going down the wrong side of the roadway and so on, I'm not sure whether you guys have any kind of agreement but neither one of you is supposed to see each other at the bus stop and you know that, okay. You can't make any side agreements, you have a Protection Order against one another being within five hundred feet of one another and it's not with exception of visitation or bus stop, correct, it has to do with all times except for communications about visitation, that's

all. And I have to tell you, * * * I believe this victim in this case and you need to understand that you violate that Protection Order every time you wait at that bus stop, but in these two occasions, on the 21st and the 29th when he was there, you just couldn't be there and he told you, you saw him, you didn't leave right away and the one time you went after him and I believe his testimony. You're upset that he missed the bus and on the other one you saw him and you shouldn't have even been there. I just, I'm not understanding what you're (sic) thinking is, why you're there, * * *. I'm going to have to find you Guilty, State proved their case beyond a reasonable doubt, two counts of violating a protection order.

{¶ 14} Tina asserts three assignments of error herein. We will consider her first two assignments of error together. They are as follows:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE,

And,

APPELLANT'S CONVICTIONS WERE BASED UPON INSUFFICIENT EVIDENCE PRESENTEND AT TRIAL.

{¶ 15} According to Tina, the "charge stemming from the events of October 21, 2014 is against the manifest weight of the evidence because the Appellant was never within 500 feet of Mr. Albright for any reason other than to communicate about the child. In the case at bar, i[t] was understood by both parties that a parent should be with the child at the bus stop in the morning." Tina asserts that a "reasonable person, like the Appellant in this case, would want to know why their child was missing from the bus stop

that morning. This type of communication, regarding a parenting issue, was allowable under the protection order." Tina asserts that since she "never got within 500 feet of Mr. Putman (sic) for any reason other than communicating about the child, Appellant's first violation of a protection order is against the manifest weight of the evidence and should be reversed."

{¶ 16} Tina asserts that on the morning of October 29, 2014, Donald called her because their son wanted to speak to her. She asserts that when he observed the flashing lights, Donald "stopped and didn't go any closer to the bus stop. * * * He was at least a block away and refused to get any closer." According to Tina, "the only evidence of the proximity between * * * Mr. Albright and the Appellant on October 29, 2014 was testimony by the Appellant that he was a block away. There is no measurement or supporting evidence that the distance between Mr. Albright and the Appellant was within 500 feet other than" Donald's opinion.

{¶ 17} Tina asserts that there "was insufficient evidence at trial to show that Appellant violated the protection order on October 21, 2014 because the Appellant was never within 500 feet of Mr. Albright for any reason other than to communicate about the child." She repeats her argument regarding the violation on October 29, 2014, and she asserts that there is no "evidence on record [that] supports a finding that Appellant was closer than 500 feet from Mr. Albright on October 29, 2014. All that exists is an admission by Mr. Albright that he was at least a block away, but still too far to be able to determine if there was someone in the car with the flashing lights."

{¶ 18} The State responds that there "is substantial and credible evidence in the record from the testimony of the victim, Mr. Albright, for the Trial Court to reasonably

conclude that all the elements of the offense of Violation of a Protection Order were proven beyond a reasonable doubt."

**{¶ 19}** As this Court has previously noted:

As a preliminary matter, we note that "[a] challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005–Ohio–6046, 837 N.E.2d 315, ¶ 69. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009–Ohio–525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the

entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014–Ohio–3432, ¶ 24, citing *Wilson* at ¶ 14.

"The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014–Ohio–3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510, *4 (Oct. 24, 1997).

"Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest

weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP–881, 2011–Ohio–3161, ¶ 11. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP–725, 2005–Ohio–2198, ¶ 15.

*State v. Hunt*, 2d Dist. Greene No. 2013-CA-79, 2014-Ohio-3839, ¶ 13-16.

**{¶ 20}** R.C. 2919.27(A)(1) provides that no "person shall recklessly violate the terms" of a protection order issued "pursuant to section 2919.26 or 3113.31 of the Revised Code." R.C. 2901.22(C) provides:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

**{¶ 21}** Donald's May 27, 2010 protection order provides in part as follows:

**REPONDENT SHALL STAY AWAY FROM PETITIONER** and all other protected persons named in this order, and shall not be present within 500 feet (distance) of any protected persons, where protected persons may be found, or any place [t]he Respondent knows or should know the protected persons are likely to be, <u>even with Petitioner's permission</u>. If

Respondent accidentally comes in contact with protected persons in any public or private place, Respondent must depart *immediately.* This order includes encounters on public and private roads, highways, and thoroughfares.

The record reflects that the protection order was amended in part as follows on May 6, 2013: "It is not a violation of the Civil Protection Order filed May 27, 2010 for the parties to communicate by phone, text or e-mail concerning parenting issues."

{¶ 22} Regarding Tina's first assigned error, we initially note that the trial court specifically found Donald to be "very credible" and Tina's testimony to be "self-serving," and we defer to the trial court's assessment of credibility. The initial complaint charged Tina with driving behind Donald and following him home. Donald provided detailed testimony that on October 21, 2014, after waiting at the bus stop where she knew that he would be with their son, Tina followed Donald in the direction of his home, on the wrong side of the street, in violation of the protection order. The second complaint charged Tina with being within 500 feet of Donald and "speaking to him other than parental concerns." Donald testified that Tina again waited at the bus stop on October 29, 2014, and that she refused to leave and demanded that Donald release their son to her. When Donald refused to release the child, Tina called him a "punk ass" and asked him if he was afraid of her brother. We note that Donald testified that in both incidents, Tina was within 500 hundred feet of him.

{¶ 23} Having reviewed the entire record, weighed the evidence and all reasonable inferences, we cannot conclude that the trial court lost its way and created a manifest miscarriage of justice in convicting Tina of twice violating R.C. 2919.27(A)(1)

such that Tina is entitled to a new trial. Donald's testimony regarding Tina's conduct on both dates is clear and Tina's testimony that it was her "normal routine" to be at the bus stop defies credulity. We conclude that Tina, with heedless indifference to the consequences, followed Donald in her car on his way home and communicated with him in a manner prohibited by the protection order. Accordingly, we find that Tina's convictions are not against the manifest weight of the evidence. Having concluded that Tina's convictions are supported by the weight of the evidence, this conclusion is further dispositive of the issue of the sufficiency of the evidence herein. For the foregoing reasons, Tina's first two assignments of error are overruled.

{¶ 24} Tina's third assignment of error is as follows:

APPELLANT'S CONVICTIONS WERE THE RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 25} According to Tina:

* * * First, trial counsel for the Appellant was deficient. When the Appellee admitted that the parties were able to communicate regarding the care of their son, counsel failed to cross examine the Appellee on whether the communication was solely regarding the son on both October 21, 2014 and October 29, 2014. Counsel never asked if there was communication on those days other than to talk about the child. Indeed, it is clear from the record that all of the communication on those days regarded the care of the child. The record establishes that counsel had no strategy for linking the communication to the care of the child, which was permitted by the protection order.

Counsel failed to make several key inquiries during the trial. Counsel failed to inquire regarding the motivation of the Appellant's presence at the bus stop. Testimony brought forth by both sides showed that the bus stop was a dark, dangerous place with raccoons. * * * Counsel did not call the child to ask him if he was scared of being at the bus stop alone in the morning. Counsel did not ask Appellant or Mr. Albright if the child expressed any fears of being at the bus stop alone. * * * Mr. Putman (sic) said that the child would sometimes be taken to the bus stop by a caregiver, which indicates that * * * Mr. Putman (sic) didn't always take the child to the bus stop. Even with that simple inference, Counsel still failed to ask either witness if the child had been alone at the bus stop by himself and refused to call the child to the stand.

Second, if counsel would have made the relevant inquire[i]es and actually prepared for trial, the outcome would have been different. If there was testimony that the child was scared and had, on previous occasion, been at the bus stop by himself, the trier of fact would have determined that the Appellant's presence at the bus stop was reasonable, and for the primary purpose of assuring her son's safety. Additionally, had Counsel linked the communications between Appellant and Mr. Albright on October 21, 2014 and 29, 2014 to the well being (sic) of the child, the trier of fact would have determined that the communications were allowable under the protection order. * * *

{¶ 26} The State responds that "defense counsel conducted a proper and relevant

cross examination of the state's witness regarding the contact between the three parties involved." The State asserts that "Appellant's arguments are based purely on conjecture and speculation as to what might have happened or perhaps could have happened."

**{¶ 27}** As this Court has previously noted:

To establish a claim for ineffective assistance of counsel, the defendant has the burden of demonstrating that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) there is a reasonable probability that the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *State v. LeGrant*, 2d Dist. Miami No. 2013–CA–44, 2014–Ohio–5803, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, to reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness, and that counsel's deficiencies were serious enough to create a reasonable probability that, but for the deficiencies, the result of the trial would have been different.

*State v. Dover*, 2d Dist. Clark No. 2013-CA-58, 2015-Ohio-4785, ¶ 7.

**{¶ 28}** Regarding Tina's assertion that defense counsel "failed to cross examine the Appellee on whether the communication was solely regarding the son on both October 21, 2014 and October 29, 2014," we initially assume that by "the Appellee," Tina intends to refer to Donald. As determined above, Tina is required to stay away from Donald, and the amended protection order only allows for communication via phone, text or email

regarding parenting issues. The record belies Tina's assertion that "all of the communication on those days regarded the care of the child." As discussed above, Donald's testimony made clear that Tina spoke to him about matters beyond parental concerns when she asked him if he feared her brother and called him a "punk ass." Further, defense counsel asked Donald if "you and Tina generally made it a practice that one of you would be with your son at the bus stop," and Donald responded "No, because from my testimony earlier I do not talk to Tina that way. We have a restraining order about that. * * *." Accordingly, we cannot conclude that defense counsel's performance was deficient in cross-examining Donald.

{¶ 29} Regarding Tina's assertion that defense counsel failed to adduce evidence regarding her motivation for being present at the stop, namely to assure her son's safety, and "failed to ask either witness if the child had been alone at the bus stop by himself and refused to call the child to the stand," in fact, Tina testified that the child was left alone at the bus stop in August, 2014, and that she was present at the location on the dates at issue at Donald's request to protect the child in his absence. Tina fails to indicate how any testimony by Donald consistent with hers about the child being alone at the bus stop in August, 2014 would have resulted in a conclusion by the trial court that Tina did not follow Donald on his way home and speak to him in a manner prohibited by the protection order in October, 2014. Further we do not find that defense counsel's failure to call the child to testify constitutes deficient performance, or that doing so would have altered the outcome of the trial. As Tina asserts, she and Donald both testified that the bus stop area is dark and dangerous in the morning. Defense counsel may have reasonably chosen not to subject the young child to testifying at trial to merely elaborate on the nature

of the bus stop and the child's purported fear thereof, and Tina offers no basis for us to find that any fear the child may have testified to about the bus stop would have led the trial court to conclude that she did not violate the protection order. Finally, regarding Tina's assertion that Donald "admitted that he doesn't always take the child to the bus stop in the morning," so that she "felt she should be present" there to protect her son, Tina mischaracterizes the record. Donald testified that he did not employ the child's caregiver to take the child to the bus stop in the morning until after October 29, 2014. Since ineffective assistance of counsel is not demonstrated, Tina's third assignment of error is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Joe Cloud
Mitchell J. Frost
Hon. Cynthia M. Heck