[Cite as *State v. Winbush*, 2017-Ohio-696.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

STATE OF OHIO

    *Plaintiff-Appellee*

v.

ROBERT V. WINBUSH

    *Defendant-Appellant*

:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 2016-CA-1

Trial Court Case No. 2015-CR-29

(Criminal Appeal from
Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of February, 2017.

. . . . . . . . . . .

MEGAN M. FARLEY, Atty. Reg. No. 0088515, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

DARRELL L. HECKMAN, Atty. Reg. No. 0002389, One Monument Square, Suite 200, Urbana, Ohio 43078
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Robert Winbush, appeals from his conviction and sentence on three counts of Felony Murder, one count of Felonious Assault, one count of Aggravated Robbery, one count of Aggravated Burglary, and one count of Grand Theft of Firearm. Following his conviction, Winbush was sentenced to a total of 18 years and 36 months (21 years) to life in prison.

{¶ 2} In support of his appeal, Winbush contends that the trial court erred in allowing the prosecution to peremptorily challenge two African-American jurors. He also contends that permitting peremptory challenges to African-American jurors is unconstitutional. In addition, Winbush argues that the trial court erred in admitting a prejudicial photograph of the decedent, that the judgment of conviction was based on insufficient evidence, and that the conviction was against the manifest weight of the evidence. For the reasons discussed below, we conclude that the assignments of error are without merit and that the judgment of the trial court should be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In January 2015, Robert Winbush was indicted for Aggravated Murder, Murder, three counts of Felony Murder, Felonious Assault, Aggravated Robbery, Aggravated Burglary, and Grand Theft of a Firearm. These charges arose from the death of William Henson, who lived on Haddix Road in Clark County, Ohio.

{¶ 4} On the evening of January 12, 2015, Henson's neighbors heard three shots. Although a gun club was located nearby and it was not unusual to hear shots, normally, there would be more than three shots. On January 14, 2015, Henson's sister, Terri, went

to Henson's house at around 10:00 a.m. Terri and her family had lived with Henson and had moved out in October 2014. Henson would often text Terri to let her know she had mail. Since she hadn't heard from him in a few days, she stopped by to make sure everything was all right. Terri's son, Raymond Zimmerman, who was also charged in the crime, had lived at the Haddix Road property with Terri's family and Henson for a short time.

{¶ 5} Although Henson kept the doors locked when he was home, the front door was unlocked. The house does not have much natural light and it was dark inside. When Terri walked in, she noticed the refrigerator door was wide open. She called out, and her brother did not answer. As she started to walk through the living room to the kitchen, she tripped over her brother. The distance from the front door to the kitchen was about 10 to 12 feet, and Henson was lying on the floor just before the entrance going into the kitchen. When Terri reached down to touch Henson, he was stiff and she knew he was dead. She ran outside and got her husband, and neighbors also came running over. The police were then called.

{¶ 6} When Deputy Ethen Cook of the Clark County Sheriff's Department arrived, Henson was lying on the floor, face down. After making sure no one else was in the home, the house was secured until detectives arrived.

{¶ 7} According to Terri, Henson was a gun collector, bordering on a hoarder. Edward Hunter, Special Agent with the Ohio Bureau of Criminal Investigation ("BCI") arrived at the crime scene and took numerous photos. He described the house as having a large amount of clutter. On entering the house, a makeshift bedroom was to the left, and a rifle was on the bed. Wardrobes to the right of the bed were open and

things were tossed onto the floor in front of the wardrobe area. The bedroom area also contained a gun rack and gun safe.

{¶ 8} The police found two cartridge cases in the middle living room area and another located near Henson's left arm. The fact that the casings were ejected indicated a semi-automatic weapon had been used, and, according to the markings on the casings, .9 millimeter bullets were involved. In addition, the police recovered parts or whole parts of three projectiles.

{¶ 9} Henson had a gunshot entrance wound on his right shoulder. The gunshot passed through the shoulder joint, did not fracture the bones, and exited from the inside of the right arm. This shot was made at a close range, perhaps less than six inches, due to the area of gun-powder stippling that was found on autopsy.

{¶ 10} Henson had two additional gunshot wounds. One wound entered on the left side of his forehead, traveled through the skull, through the left side of the brain diagonally to the right side of the brain, and exited on the back right side of the head. The other bullet entered on the underside of the left chin, fractured the jaw bone, and exited, making a large, gaping laceration of the left temple. The wounds to the head were sufficient to cause death and would have caused death instantaneously.

{¶ 11} In addition, Henson had bruising and laceration of the lower lip, bruising with a little abrasion just below the nose, and bruising around the right eye, right cheekbone, and right temple area. According to the coroner, the bruising over the eye and cheekbone happened before Henson was killed, because once the heart stops beating, there is insufficient blood pressure to force enough blood from the capillaries to cause bruising. Henson also had a wound to his thumb that was caused by animal

predation, i.e., by a cat, dog, or other animal after death.[1]

{¶ 12} Henson was also found with his front pants pockets pulled out on both sides. Based on bullet impacts found on nearby objects and walls, and blood spatter evidence, Special Agent Hunter concluded that a blood shedding had occurred while Henson was either lying on the floor or was low to the floor. A blood shedding occurs when a person is struck or shot with force that causes blood to come from the individual.

{¶ 13} Special Agent Hunter was also asked to process Winbush's apartment, which was located at 300 Williams Street, in Fairborn, Ohio. On January 14, 2015, an individual named Robert Henderson was arrested for theft and forgery. Henderson was acquainted with Winbush and stayed at times at Winbush's apartment. Following his arrest, Henderson spoke to the police about having seen guns in Winbush's apartment. After speaking with Henderson, Detective Todd Shillito developed Raymond Zimmerman and Robert Winbush as suspects, and obtained search warrants for both their apartments. At the time, Zimmerman was living at an apartment located at 340 Wallace Drive, in Fairborn, about a street away from Winbush's apartment.

{¶ 14} Henderson testified that on the evening of January 13, 2015, he had seen quite a few guns in Winbush's apartment. The guns were leaning up against the wall in the kitchen and were along the hallway into the living room. The guns were not there when Henderson had last stayed at the apartment, several days before. Henderson also saw a safe (identified as having been taken from Henson's home) in Winbush's bedroom. Winbush asked Henderson to take the safe to the dumpster, but Henderson refused because it looked like the door of the safe had been "tossed," and he knew it was not

---

[1] Henson's German Shepard dog was in the house when Henson's sister arrived.

something he wanted to touch. Henderson saw Winbush take the safe to the dumpster, where it was later found by the police.

{¶ 15} Henderson also indicated that on the morning of January 14, 2015, Zimmerman and another person came to the apartment, got two guns, and left. Zimmerman was carrying a weapon, as he always did. In addition, Henderson stated that by the morning of January 14, 2015, only a few guns were left in Winbush's apartment.

{¶ 16} When the police searched Winbush's apartment on January 15, 2015, they did not find any firearms. They did find a magazine from a semiautomatic weapon, a box of .9 millimeter ammunition, some other boxes of ammunition, and several index cards that listed different models and types of guns. In a dumpster close to Winbush's apartment, the police found a safe that been pried open, with items of property inside. These items included a vehicle title registered to Henson and checkbooks in Henson's name. Two rifles were also located inside the dumpster. A search of a vehicle registered to Eva Winbush also uncovered some ammunition cartridges and a box of shotgun shells for a 12-gauge shotgun. The ammunition was not the same type that had been expelled in Henson's residence.

{¶ 17} As was noted, Raymond Zimmerman was Henson's nephew. At the time of the murder, Zimmerman had been living for a few weeks in the basement of Danielle Sargent's apartment, which was located at 340 Wallace Drive, in Fairborn. Sargent lived there with her boyfriend, Justin Knight, and her young son. She denied knowing any guns were in the basement, and denied helping her boyfriend and Zimmerman carry the guns into the basement.

{¶ 18} BCI Special Agent, Bryan White, was assigned to the crime scene at 340 Wallace Drive. This search also took place on January 15, 2015. White found more than 30 firearms, including shotguns, rifles, a pistol, a revolver, and a .9 millimeter Taurus firearm. In addition, he found tubs containing ammunition of various sizes, including shotgun shells, .22 rifle cartridges, and other calibers of ammunition. There were at least 500 rounds of ammunition. The .9 millimeter Taurus firearm that was found was tested, but was found not to be the weapon that was used in the murder. That particular weapon was never recovered.

{¶ 19} Detective Shillito, who was in charge of the investigation, matched the firearms that were found in Zimmerman's residence to the firearms listed on the seven index cards found in Winbush's apartment. Most of the information on the cards, like model and type of weapon, was taken right off the barrels or breach of these weapons. As just one example, Ex. 70, a Ward's Western, Model 16M, 20-gauge firearm, was matched to item 11 on the list on the index cards.

{¶ 20} Winbush was arrested on January 15, 2015, and was interviewed while in custody, after receiving and waiving his Miranda rights. A DVD of this interview was played for the jury. During the interview, Winbush admitted driving the car to Henson's house, being inside Henson's residence, and helping carry some of the firearms out of the residence. Winbush also changed his answers during the interview. First, he said he stayed in the car; then he admitted going to the door of the house, but claimed he did not do anything or see anything. Then, Winbush admitted being inside the house, and seeing Zimmerman shoot Henson in the back. He also admitted carrying guns, but not the safe, and eventually admitted carrying the safe out as well. And, he admitted going

to Henson's home to steal guns. He also said during the interview that as soon as they got into the house, Zimmerman went crazy and started shooting.

{¶ 21} At the conclusion of the interview, Winbush wrote a letter of apology to Henson's family. This letter stated as follows:

> "To the family of the victim, I feel so bad for what happened. I am deeply sorry about your loss. I would like – I would just want you to know that I did not murder him. Raymond Zimmerman did it all. All his plans, I had no idea that he was going to do it. I feel so bad. I think about it all the time, hard to sleep; but Raymond want to – went to the door, uncle opened the door, and Raymond fired the gun. If I knew he was gonna kill him, I would never went."

Transcript of Proceedings, Vol. III, p. 367. *See also* State's Ex. 208.

{¶ 22} At the conclusion of the State's case, the trial court granted Winbush's Crim.R. 29 motion for acquittal as to the first two counts of the indictment (Aggravated Murder and Murder). Winbush then presented one witness – his sister, who was dating Zimmerman at the time. She testified that she had seen Zimmerman and someone else moving guns wrapped in a sheet into Sargent's house on January 13, 2015, and that her brother was not involved in moving the guns.

{¶ 23} After hearing the testimony, the jury convicted Winbush of all charges, and he was sentenced as noted above. Winbush now appeals from his conviction and sentence.

II. *Batson* Challenge

{¶ 24} Winbush's First Assignment of Error states that:

The Trial Court Erred in Permitting the Prosecutor to Peremptorily Challenge Two (2) African-American Jurors in Violation of the Standards of *Batson v. Kentucky*.

{¶ 25} Under this assignment of error, Winbush contends that the trial court erred in allowing the State's peremptory challenges of two African-American jurors because the State's reasons for making these challenges were flimsy and unpersuasive. In response, the State argues that Winbush failed to make a prima facie case of showing discriminatory intent. The State also contends that it provided race-neutral reasons, which the trial court accepted.

{¶ 26} "The Equal Protection Clause of the Fourteenth Amendment strictly prohibits a state actor from engaging in racial discrimination in exercising peremptory challenges. Such discrimination is grounds to reverse a conviction returned by a jury tainted with such discrimination." *State v. Murphy*, 91 Ohio St.3d 516, 528, 747 N.E.2d 765 (2001), citing *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Other citation omitted.)

{¶ 27} "A court adjudicates a *Batson* claim in three steps. In step one, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination. In step two, the proponent must come forward with a race-neutral explanation for the strike. In step three, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination." (Citations omitted.) *Id.* "A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous." (Citations omitted.)

*State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 64.

{¶ 28} To establish a prima facie case, "the defendant first must show that he is a member of a cognizable racial group, * * * and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." (Citation omitted.) *Batson*, 476 U.S. at 96, 106 S.Ct. 1712, 90 L.Ed.2d 69. "Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Id.*, quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the * * * jury on account of their race." *Batson* at 96. "This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination." *Id.*

{¶ 29} An inference can arise through "a 'pattern' of strikes against black jurors included in the particular venire * * *." *Id.* at 97. "Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.* "Apparent racial discrimination may be evident from the record by questions, remarks or comments relating to a single peremptory strike." *State v. Greene*, 2d Dist. Montgomery No. 24307, 2011-Ohio-4541, ¶ 10.

{¶ 30} Nonetheless, "[o]nce the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot." *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140

(1999), citing *Hernandez v. New York* , 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and *State v. Hernandez*, 63 Ohio St.3d 577, 583, 589 N.E.2d 1310 (1992). *Accord State v. Manns*, 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657, ¶ 38 (2d Dist.).

{¶ 31} Because the State offered an explanation for its peremptory challenges and the trial court ruled on them, the issue of whether Winbush made a prima facie case is moot.

{¶ 32} With respect to the State's first peremptory strike of an African-American, the juror in question had previously been charged with a burglary, and the State concluded that having been in a similar situation would prevent him from being a good juror. The court determined that this was a race-neutral explanation. Transcript of Proceedings, Vol. I, pp. 114-115.

{¶ 33} Regarding the second prong of analysis, "[a]lthough a simple affirmation of general good faith will not suffice, the prosecutor's explanation 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 49, quoting *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. "In fact, * * * the 'second step of this process does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." ' " *State v. Gowdy*, 88 Ohio St.3d 387, 392, 727 N.E.2d 579 (2000), quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). (Other citation omitted.) *Accord Carver* at ¶ 49.

{¶ 34} In the case before us, the prosecutor's explanation bears no discriminatory intent. The juror in question stated that he had been accused of robbery, and was convicted of a misdemeanor.[2] While the juror also stated that he believed that "if you play, you pay," he also said that he did not do what he was accused of, but that it did not bother him that much. Transcript of Proceedings, Vol. I, pp. 66-67. The State might have been entitled to view this latter comment with some skepticism.

{¶ 35} Regarding the final step of the analysis, after a review of the transcript, we cannot find that the trial court's decision was clearly erroneous.

{¶ 36} The defense also objected to the exclusion of a second African-American juror (Ms. H). Again, assuming the prima facie case is moot, the State's explanation was as follows:

> MR. DRISCOLL: I would point out for the record that upon removing her, she will be replaced by another African-American female. Ms. H * * * on some different occasions, was very aggressive and shaking her head in agreement with suggestions someone couldn't be held responsible for the actions of another. She also made a face and shook her head no when I gave her the hypothetical about the developed murder. Based on those, I don't believe she's good for this jury.

*Id.* at p. 116.

{¶ 37} This explanation was facially valid. The trial court then granted the State's

---

[2] While the juror said he had been charged with a robbery, the prosecutor used the term "burglary" when discussing the peremptory challenge with the court. The difference in terminology makes no difference, because Winbush was charged with both Aggravated Robbery and Aggravated Burglary.

peremptory challenge, but did not provide a specific reason. However, the court had just observed that it saw no pattern of discrimination, and the juror, in fact, was being replaced by another juror of the same race. *Id.* at pp. 114 and 116. Under the circumstances, and given the fact that the State failed to thereafter use all its peremptory challenges, we cannot say the trial court's decision was clearly erroneous. *Id.* at p. 128.

{¶ 38} Winbush argues that this case is controlled by *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317,162 L.Ed.2d 196 (2005). We disagree. In that case, the State used preemptory strikes to eliminate 10 of 11, or "91% of the eligible black venire panelists, a disparity unlikely to have been produced by happenstance." *Id.* at 232. In addition, the court found that the prosecution had engaged in broader patterns of practice during jury selection that supported a finding of discrimination. This involved a practice permitted by Texas law which permitted either side to shuffle cards bearing panel names during selection, as well the fact that contrasting voir dire questions were posed to African-American and white jurors. *Id.* at 233-234. And finally, the court observed that "the Dallas County District Attorney's Office had, for decades, followed a specific policy of systematically excluding blacks from juries." *Id.* at 234.

{¶ 39} No such evidence appears in the record before us. Accordingly, the First Assignment of Error is without merit and is overruled.


III.   Unconstitutionality of *Batson*

{¶ 40} Winbush's Second Assignment of Error states as follows:

The Trial Court Erred in Permitting the Peremptory Challenge of Two

(2)   African-American   Jurors   as   Peremptory   Challenges   Are

Unconstitutional.

{¶ 41} Under this assignment of error, Winbush argues that peremptory challenges should be held unconstitutional based on the reasoning espoused by Justice Breyer in his concurring opinion in *Miller-El*. See *Miller-El v. Dretke*, 545 U.S. at 266-273, 125 S.Ct. 2317, 162 L.Ed.2d 196 (Breyer, J., concurring). In his concurring opinion, Justice Breyer raised practical problems of proof relating to the *Batson* test and the fact that despite *Batson*, discriminatory use of peremptory challenges is still a problem. *Id.* at 267-268. He also argued that "peremptory challenges seem increasingly anomalous in our judicial system." *Id.* at 269. This latter point was based, among other things, on arguments that scientific techniques now being used for jury selection may contribute to public cynicism about the jury system, and that a right to a jury free of "discriminatory taint" is constitutionality protected, while a right to peremptory challenges is not. *Id.* at 374.

{¶ 42} Even assuming the validity of these points, the Supreme Court of the United States has established the test in *Batson* and all lower courts are bound to follow the law as expressed by that court. Accordingly, the Second Assignment of Error is overruled.


IV.   Error in Admitting a Photograph

{¶ 43} Winbush's Third Assignment of Error states that:

The Trial Court Erred in Admitting into Evidence, over Objection, a

Gruesome Photograph of Decedent that Did Not Reflect His Body at Death

but Displayed His Sawed Off Skull After Autopsy.

{¶ 44} Under this assignment of error, Winbush argues that the trial court erred in

admitting a photograph (State's Ex. 183), which showed Henson's open skull after the pathologist had removed Henson's brain and the top of his skull. Winbush contends that this photograph was inflammatory and was also unnecessary because there was no contention that Henson had died from a cause other than murder.

{¶ 45} Under Evid.R. 403 and 611(A), trial courts have sound discretion concerning the admission of photographs. *State v. Maurer*, 15 Ohio St.3d 239, 264, 473 N.E.2d 768 (1984). An abuse of discretion indicates a trial court attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). We have frequently stressed that "[m]ost abuses of discretion 'will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.' " *Kossoudji v. Stamps*, 2d Dist. Montgomery No. 27170, 2016-Ohio-7693, ¶ 22, citing *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). (Other citation omitted.) "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Enterprises* at 161.

{¶ 46} In *State v. Moss*, 2d Dist. Montgomery No. 22496, 2008-Ohio-6969, we observed that "[t]t is to be expected that most photographs of a murder victim will depict blood and will be gruesome by their very nature. For that reason, 'the mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible.' " *Id.* at ¶ 28, quoting *Mauer* at 264-265. (Other citation omitted.) We further noted that

" '[n]on-repetitive photographs ..., even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused.' " *Id.*, quoting *State v. Jalowiec*, 91 Ohio St.3d 220, 229, 744 N.E.2d 163 (2001).

**{¶ 47}** As an initial matter, we note that the trial court admitted only one photograph of the skull after the brain had been removed.   The State notes that this photograph was necessary to prove the State's theory that at least one of the gunshot wounds occurred after the victim was already on the ground.   The importance of this was to dispute Winbush's testimony that Zimmerman shot Henson immediately as he entered, without apparent knowledge by Winbush.

**{¶ 48}** The pathologist used the photograph to demonstrate the bullet shards and extensive fracture to the skull as well as the entrance and exit wounds.   While this photograph no doubt was unpleasant, it was non-repetitive, and it showed injuries that the other photographs did not.   *Compare State v. Hayes*, 2d Dist. Montgomery No. 26379, 2016-Ohio-7241, ¶ 74-76 (finding probative value not outweighed by prejudice in similar circumstances, because the photograph of the skull after the brain had been removed helped the jury understand the cause of death and depicted injuries that other photographs did not.)

**{¶ 49}** Winbush urges us to compare the facts of this case to *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064 (1975), where the Supreme Court of Kansas reversed the defendant's conviction for, among other things, admission of repetitious gruesome photographs of the decedent.   *Id.* at 377-378.   In *Boyd*, the court stated that:

>This court has gone a long way, perhaps too far, in countenancing the introduction of grisly, gruesome photographs.   Here exhibit 39 showed the

body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant. A flap of chest skin partially covers the deceased's face and the chest and abdominal organs of the deceased are presented in full view. In this case the cause of death of the victim was really not in dispute. The state's medical expert made it clear that death was due to internal bleeding resulting from stab wounds. Some of the photographs which were admitted could have been helpful to the jury by showing the angle of penetration of the murder instrument into the deceased's body. We fail to see the necessity, however, of the state's offering repetitious exhibits to prove the same point.

*Id.*

{¶ 50} The circumstances in *Boyd* are not similar to those in the case before us. On review of the record, we agree with the State that the photograph was admissible in connection with the State's theory and was not unduly prejudicial. We also note that the defense failed to object when Ex. 183 was initially displayed to the jury and discussed. Transcript of Proceedings, Vol. II, pp. 282-283. As a result, the jury had already seen the photo prior to the time it was admitted into evidence. Finally, the trial court did exclude a photo to which the defense objected, i.e., one depicting the injuries sustained by animal predation. While the defense also did not object to this photograph when it was initially displayed to the jury, the photo was not necessary to assist the State in proving its theory of the case and need not be admitted. In contrast, admission of Ex. 183 was not an abuse of discretion.

{¶ 51} Based on the preceding discussion, the Third Assignment of Error is

overruled.

## V.   Sufficiency of the Evidence

{¶ 52} Winbush's Fourth and Fifth Assignments of Error state that:

The Judgment of Conviction Was Based on Insufficient Evidence as a Matter of Law.

The Judgment of Conviction Was Against the Manifest Weight of the Evidence.

{¶ 53} Under these assignments of error, Winbush contends that his conviction was based on insufficient evidence and was against the manifest weight of the evidence. In this regard, he relies on his DVD statement (Ex. 209) and his apology statement (Ex. 208), which indicate that Winbush thought he was going to be involved in a "simple theft" of guns.

{¶ 54} Before addressing these assignments of error, we note that the State incorrectly argues in its brief that Winbush was convicted of Murder and had purposeful intent to murder (or shared in Zimmerman's purposeful intent to murder Henson).   State's Brief, p. 13.   Winbush was not convicted of Murder.   He was initially charged with Aggravated Murder and Murder, as well as three counts of Felony Murder.   However, the trial court dismissed the Aggravated Murder and Murder charges at the conclusion of the State's case.   Transcript of Proceedings, Vol. III, p. 435.

{¶ 55} Winbush was convicted of three counts of Felony Murder as well as the underlying charges of Aggravated Burglary, Aggravated Robbery, and Felonious Assault, with firearm specifications, and Grand Theft of a Firearm.   At sentencing, the trial court

merged the underlying offenses with the three counts of Felony Murder, and the State elected to proceed on the Felony Murder conviction based on the underlying Aggravated Robbery. Transcript of Proceedings, Disposition, p. 17.[3]

{¶ 56} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 57} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence

---

[3] Despite the State's election, the trial court sentenced Winbush on all three Felony Murder convictions (Counts Three, Six, and Eight), sentenced him to 15 years to life on each count, and imposed these sentences concurrently. Transcript of Proceedings, Disposition, pp. 17-18, and Judgment of Conviction, Doc. #49, pp. 2-3. Winbush has not raised the court's sentence for three counts of Felony Murder, nor has the State appealed the court's decision to merge the underlying offenses with the Felony Murder counts.

is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this case, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 58} }"Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17; *State v. Putman-Albright*, 2d Dist. Montgomery Nos. 26679, 26685, 2016-Ohio-319, ¶ 19. Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 59} As an additional matter, "[b]ecause the factfinder * * * has the opportunity

to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 60} "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2d Dist. Montgomery No. 21531, 2007-Ohio-1029, ¶ 28, citing *Lawson* at *4.

{¶ 61} As was noted, Winbush was charged with three counts of Felony Murder, in violation of R.C. 2903.02(B). This statute provides that:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

{¶ 62} The underlying offenses of violence charged in the indictment were Aggravated Robbery, Aggravated Burglary, and Felonious Assault. We have previously noted that "the General Assembly kept the felony-murder provision's scope narrow * * * by using the phrase 'as a proximate result of.' " *State v. Mays*, 2d Dist. Montgomery No.

24168, 2012-Ohio-838, ¶ 10. "Under this theory, ' "generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct. Second, when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable." ' " *Id.*, quoting *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002 WL 191582, *6. (Other citations omitted.)

{¶ 63} Furthermore, consistent with the fact that a showing of purpose is not required, the Supreme Court of Ohio has emphasized in connection with R.C. 2903.02(B), that "[t]he felony-murder statute imposes what is in essence strict liability. Though intent to commit the predicate felony is required, intent to kill is not." (Citations omitted.) *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016, ¶ 9. In *Nolan*, the court relied on a case from New York's highest court, which had stated that " '[t]he basic tenet of felony murder liability is that the mens rea of the underlying felony is imputed to the participant responsible for the killing. By operation of that legal fiction, the transferred intent allows the law to characterize a homicide, though unintended and not in the common design of the felons, as an intentional killing.' " *Id.* at ¶ 9, quoting *People v. Hernandez*, 82 N.Y.2d 309, 317, 604 N.Y.S.2d 524, 624 N.E.2d 661 (1993). *Accord State v. Taylor*, 2d Dist. Montgomery No. 26896, 2016-Ohio-5541, ¶ 15-17.

{¶ 64} Unquestionably, there was ample evidence to support the underlying offenses. The Aggravated Robbery charge was based on R.C. 2911.01(A)(1), which states that "No person, in attempting or committing a theft offense, as defined in section

2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *."

{¶ 65} The Felonious Assault charge was based on R.C. 2903.11(A)(2), which provides that "No person shall knowingly do either of the following: * * * (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶ 66} And finally, the Aggravated Burglary charge was based on R.C. 2911.11(A)(1), which states that "No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another * * *."

{¶ 67} There was some suggestion at trial that Winbush and Zimmerman may initially have been permitted in the house because Zimmerman and Henson were related. Notably, Henson normally kept his home locked, and there were no signs of forcible entry. Winbush's statement to police also indicated that Zimmerman knocked on the door and they were permitted to enter. Nonetheless, we have held that "one who enters a home with permission becomes a trespasser, subject to conviction for aggravated burglary, if he assaults the victim after gaining entry." *State v. Perry*, 2d Dist. Montgomery No. 26421, 2015-Ohio-2181, ¶ 29, citing *State v. Steffen*, 31 Ohio St.3d 111, 114-115, 509

N.E.2d 383 (1987).

{¶ 68} As an additional matter, while the State did not prove which party, i.e., either Zimmerman or Winbush, assaulted and killed Henson (or both), the State was not required to do so. The jury was instructed on complicity. Transcript of Proceedings, Vol. IV, pp. 517-518.

{¶ 69} The Supreme Court of Ohio has said that "[t]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. R.C. 2923.03(F) further states that "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

{¶ 70} In *Johnson*, the court stressed that " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.*

{¶ 71} The facts of this case do not indicate that Winbush was an innocent bystander. By his own admission, Winbush went to Henson's house to steal guns. He also admitted knowing that Zimmerman had carried a weapon in the past. Further, once

Winbush and Zimmerman entered Henson's house, Winbush admitting seeing Zimmerman shoot Henson. According to the evidence presented by the State, Henson's pants pockets were turned inside out, which leads to an inference that Henson was searched for money after he had been shot. There was also evidence indicating that Henson received injuries to his face prior to death, which contradicts Winbush's claim that Zimmerman shot Henson immediately upon entry, without Winbush's prior knowledge. This testimony was also contradicted by the distance of Henson's body from the front door, by the fact that one of the shots was at close range, and by the fact that another shot occurred when Henson was close to the ground.

{¶ 72} In addition, Winbush helped Zimmerman carry weapons and a safe from Henson's home, and then transported the stolen items to his own apartment, where they were catalogued on index cards. After the safe had been broken into and damaged, Winbush carried the safe to a dumpster near his home and disposed of it. At no time did Winbush attempt to withdraw from the venture. Although Winbush claimed in his statement that he had no idea that Zimmerman was going to murder Henson, he certainly assisted Zimmerman and never contacted the police to report what Zimmerman had allegedly done. These actions belie any claim of having been an innocent bystander.

{¶ 73} Accordingly, we reject the claim that the conviction was either based on insufficient evidence or was against the manifest weight of the evidence. As a result, the Fourth and Fifth Assignments of Error are overruled.

## VI. Conclusion

{¶ 74} All of Winbush's assignments of error having been overruled, the judgment

of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.

Copies mailed to:

Megan M. Farley
Darrell L. Heckman
Hon. Richard J. O'Neill