[Cite as *State v. Watson*, 2021-Ohio-2218.]

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28914 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-2768 |
| | : | |
| TYLIN WATSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of June, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 101 Southmoor Circle NW, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Tylin Watson appeals from his convictions for murder, aggravated robbery, tampering with evidence, and having weapons while under disability. In support of his appeal, Watson asserts that the evidence was legally insufficient and that the evidence weighed heavily against his conviction.

{¶ 2} For the reasons discussed below, we conclude that the trial court's judgment was based on sufficient evidence and was not against the weight of the evidence. Accordingly, the judgment of the trial court will be affirmed.

## I.    Facts and Procedural History

{¶ 3} On May 28, 2018, Sorin Farcas died after being shot in the head during a drug transaction.   Following an investigation, Watson was arrested and indicted on four counts of murder, three counts of aggravated robbery, two counts of felonious assault, one count of tampering with evidence, one count of kidnapping, and one count of having weapons under disability.   All of the counts carried firearm specifications with the exception of having weapons while under disability.   A jury trial was conducted on all the charges except having weapons while under disability, which was subsequently tried to the bench.

{¶ 4} The State presented the testimony of Ronald Hughes, who was with Watson at the time of the shooting.   According to Hughes, he was with his girlfriend M.H.[1] during the early morning hours of May 28, 2018.   Hughes testified he was driving in his white Toyota with M.H. while she was messaging someone from whom she wanted to buy marijuana.   M.H. had asked Watson if he wanted to go with her to buy marijuana, so the

---

[1] Because M.H. was a juvenile at the time of the offense, we will refer to her by her initials.

pair stopped to pick him up. At the time, Watson was wearing a "hoodie." Tr. p. 309. The trio went to a nearby park to meet the seller. Hughes testified that M.H. and Watson exited the car in order to make the purchase. However, they returned to the car without any marijuana. M.H. then messaged the seller again and was given another address at which meet.

{¶ 5} M.H. used her phone's GPS system to navigate to an address located on Charnwood Drive in Huber Heights. Hughes testified that he drove a few houses past the designated address before he stopped and parked his car on the side of the road; M.H. and Watson then exited the vehicle, but Watson told M.H. to stay with the car. Watson walked uphill toward the seller's address, and M.H. got into the backseat of the car. Watson had been gone for a few minutes when Hughes heard a gunshot. Watson returned and got back into the car. Hughes observed Watson holding a revolver and a "large Ziploc bag * * * full of marijuana." Tr. p. 312. According to Hughes, Watson had the hood on his sweatshirt pulled up over his head when he returned to the car. Watson's gun was pointed toward Hughes when he ordered Hughes to drive away and to "keep his mouth shut." Tr. p. 313. M.H. asked Watson what had occurred, and Watson said, "I popped him." *Id.* Hughes testified that he understood Watson to mean that he had shot someone. Hughes eventually dropped Watson off in Dayton near a convenience store. Hughes admitted that he did not call the police afterward; indicated he did not do so because he believed he would endanger himself and his family if he spoke to the police. Hughes indicated that he stopped dating M.H. after the incident.

{¶ 6} M.H. also testified on behalf of the State. Like Hughes, she testified that she had been trying to purchase marijuana during the early morning hours of May 28, 2018.

She testified that she posted her request on a social media outlet and received a response from Farcas. M.H. asked Watson, whom she had known for about one year, if he wanted to accompany her to the buy. When Watson responded affirmatively, Hughes and M.H. picked him up and traveled to a park to meet Farcas. Farcas did not show up at the park, but he texted M.H. and told her to meet him at his house in Huber Heights. He also texted her his address. M.H. then used her phone's GPS system to locate the address.

{¶ 7} M.H. testified that, during the drive, she showed Watson a picture of Farcas from one of Farcas's social media apps. According to M.H., Watson said Farcas looked "lame" and that he could "just run off with his stuff," which led M.H. to believe that Watson was going to take Farcas's marijuana without paying. Tr. p. 517. She testified that Watson went up to Farcas's home while she sat in the car with Hughes. Approximately six minutes later, M.H. heard a "loud pop" which sounded like a gunshot coming from the house. Tr. p. 520. She testified that Watson returned to the car approximately 30 seconds after the gunshot and that he had the hood on his red sweatshirt pulled up.

{¶ 8} According to M.H., when Watson entered the car, he told Hughes to "hurry up and drive," and that he had shot Farcas in the head. Tr. p. 522. M.H. also observed Watson had a clear bag containing marijuana and an iPhone, which he turned off as soon as he entered the car. Watson gave M.H. 10 to 12 grams of the marijuana, which was approximately half of the contents of the bag.

{¶ 9} M.H. admitted she was charged in juvenile court for her role in these events. Specifically, she was charged with offenses that, were she an adult, would have constituted aggravated robbery and involuntary manslaughter. The State sought to have M.H. bound over to the common pleas court to be tried as an adult, but the juvenile court

retained jurisdiction. Eventually, a plea agreement was reached, and M.H. was remanded to the Ohio Department of Youth Services. She remained in custody for approximately one year and was on parole at the time of Watson's trial.

{¶ 10} Michael Ballweg testified that he and Farcas met while working at the same restaurant and that he would purchase marijuana from Farcas. Ballweg was at work during the early morning hours of May 28. Ballweg did not own a car, so he texted Farcas to ask for a ride home from work. Farcas arrived at the restaurant at approximately 3:00 a.m. and informed Ballweg he would take him home but that he needed to first stop at his own residence in order to make a marijuana sale. The two drove to Farcas's home on Charnwood Drive in Huber Heights, pulled into the driveway, and then went into the garage.

{¶ 11} According to Ballweg, the garage contained a table, chairs, and a sofa. Ballweg testified that he and Farcas sat down with the garage door open and noticed a "really loud white car" drive past Farcas's house. Tr. p. 399. Ballweg testified that, after he and Farcas had been seated for two to three minutes, a man ran into the garage. According to Ballweg, the man was wearing a "red hooded sweatshirt," with the hood up. Tr. p. 419. Ballweg testified the sweatshirt was zipped and the hood was tied.

{¶ 12} The man had a gray revolver, which he pointed at both Ballweg and Farcas. The man then demanded the marijuana which was sitting out on the table. According to Ballweg, Farcas handed the man the bag of marijuana. The man then demanded that Farcas hand over his cell phone. Farcas initially refused, but the man again demanded the phone, and Farcas handed it to him. Ballweg testified that the man also demanded Farcas provide him with the password for the phone, and Farcas complied. The man

then pointed the gun at Ballweg and asked him what Ballweg had in his possession. Ballweg reached into his pocket and pulled out a bill which was either a "ten or a five-dollar bill," and handed it to the man.

{¶ 13} At this point, Farcas rose from his chair and was moving toward the door. The man ordered Farcas to sit down. Farcas then said, "I'm not going to go out like that, you're going to have to kill my ass." Tr. p. 406. Farcas began to run toward the man, and the man shot him in the head. The man then ran out of the garage and got into the white car, which drove away. Ballweg called 911.

{¶ 14} Ballweg was not able to identify Watson in a photospread lineup because the hoodie had covered a large portion of the shooter's face. However, he described the shooter as an African-American with a goatee, a description which, at the time, fit Watson.

{¶ 15} Brad Daugherty, a captain with the Montgomery County Sheriff's Department, also testified for the State. According to Daugherty, he was investigating an unrelated homicide when he interviewed Kalesha Whitner, who was Watson's girlfriend at the time of the Farcas shooting. During the interview, Whitner, without prompting, provided information regarding the Farcas shooting. Following the interview, Daughtery contacted the Huber Heights Police Department to determine whether the department was investigating a case involving the facts provided by Whitner. After learning that the details provided by Whitner matched the facts of the Farcas case, Daughtery introduced Whitner to detectives from Huber Heights.

{¶ 16} Whitner testified that Watson contacted her around 4:00 a.m. on the morning of May 28, 2018 and asked her to pick him up. She testified Watson got into her car and told her he had killed someone. Watson explained that he and a girl had

gone to Huber Heights where he met two boys; one of the boys was "scared," but the other was "acting tough." Tr. p. 588. Watson stated that he killed the one who was acting tough. Watson told Whitner the boy he killed was white, a description fitting Farcas. Whitner noted Watson had a silver revolver and marijuana. The two later met some friends and smoked the marijuana.

**{¶ 17}** Whitner testified that she was eventually charged with aggravated robbery and murder in the unrelated case. She admitted that she had reached a plea agreement with the State which allowed her to plead guilty to involuntary manslaughter, theft of a firearm, and aggravated robbery. The plea agreement also required her to testify truthfully against her co-defendants in the unrelated case as well as against Watson in this matter.

**{¶ 18}** The jury acquitted Watson on the charge of kidnapping. The jury convicted Watson of all the remaining counts and specifications before it. The count of having weapons under disability was tried to the court, and the court found Watson guilty. The trial court sentenced Watson to an aggregate prison term of 49 years to life.

**{¶ 19}** Watson appeals.

## II.     Analysis

**{¶ 20}** The first and second assignments of error asserted by Watson are as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT, AS A MATTER OF LAW, TO PROVE APPELLANT'S GUILT BEYOND A REASONABLE DOUBT.

THE VERDICTS OF GUILTY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 21} In his two assignments of error, Watson asserts that the State did not introduce evidence sufficient to sustain the convictions and that the verdicts were against the manifest weight of the evidence. In support, Watson contends the State failed to establish identity. We note his entire argument hinges upon his claim that Hughes, M.H., and Whitner were not credible and that the jury thus erred in crediting their testimony.

{¶ 22} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). When reviewing a challenge to sufficiency, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which provides:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 23} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence

is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When engaged in a review of a manifest weight challenge, a " 'court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 24} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McC*rary, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501 (2d Dist.), ¶ 58; *State v. Putman-Albright*, 2d Dist. Montgomery Nos. 26679, 2016-Ohio-319, ¶ 19. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 25} Importantly, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is

within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 26} We first turn to the issue of sufficiency. The testimony provided by Hughes and M.H., if believed, established that Hughes, M.H., and Watson drove to Farcas's residence in order to purchase marijuana after failing to make the transaction at the park. Both M.H. and Hughes testified that they parked a few houses past Farcas's residence and that Watson left Hughes and M.H. in the car while he walked up the hill to the home. Hughes and M.H. both testified that Watson was wearing a hoodie at the time and that they heard a gunshot after Watson walked up to the house. Additionally, they both testified that Watson returned to the car with a bag of marijuana and admitted to killing the seller. M.H. testified that Watson also had an iPhone, which he immediately turned off. The evidence in the record established that Farcas's iPhone was turned off at 3:16 a.m. Hughes also testified that Watson was holding a revolver when he returned to the car, and both testified that Watson's hoodie was pulled up when he returned to the car.

{¶ 27} Ballweg testified that, when Farcas picked him up at work, Farcas told Ballweg he had to hurry home in order to meet a girl to whom he was selling marijuana. Ballweg and M.H. both testified that the transaction was set up over a social media app called "Snapchat." Ballweg testified that a loud white car drove by Farcas's open garage just prior to the man wearing a red hoodie entering the garage. This corresponded with Hughes's testimony that the brakes on his white vehicle were loud and could be heard from a distance. Ballweg testified that the shooter entered the garage with a dirty gray revolver, immediately demanded that Farcas give him the marijuana, and then demanded Farcas's iPhone. Ballweg observed the shooter kill Farcas and then return to the white

car.

{¶ 28} Whitner also testified that Watson had a rusty silver revolver and told her he had killed a white boy during a marijuana transaction. She also testified that Watson had marijuana, which they later smoked.

{¶ 29} Further, as noted by the State, the "bullet that killed Farcas was consistent with a .38 caliber bullet which is typically fired by a revolver and was consistent with having been fired from a revolver. Likewise, no casings were found on scene which would further indicate that Watson used a revolver to shoot Farcas."

{¶ 30} This evidence, although circumstantial as to Watson's identity, was sufficient to establish that Watson shot and killed Farcas. In Ohio, it is well-established that "a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. * * *' " *Id.*, at 150, quoting *Black's Law Dictionary* 221 (5 Ed. 1979).

{¶ 31} We next turn to the claim that Hughes, M.H., and Whitner lacked credibility. In support, Watson first notes that Hughes and M.H. were romantically involved and thus had a reason to protect each other. He further claims that their testimony was rendered incredible because there were discrepancies between their respective versions of events. For example, Watson notes that Hughes testified that he (Watson) returned to the car after the shooting and stated he had "popped" someone, while M.H. testified that he (Watson) returned to the car and "he basically said, he was like, I blasted him. He said

he shot him. He told me he shot him in the head." Tr. p. 521. Watson further notes that neither Hughes nor M.H. called the police after the shooting, and they only spoke with the police after the police contacted them. Additionally, during their initial interviews, both denied involvement in the incident.

{¶ 32} All of the issues cited above were pointed out to the jury during the course of the trial; thus, we may presume the jury accounted for these matters as part of its evaluation of the credibility of the State's witnesses. *State v. Lynch*, 2d Dist. Montgomery No. 27620, 2018-Ohio-1424, ¶ 17, citing *State v. Spraggins*, 8th Dist. Cuyahoga No. 85686, 2005-Ohio-5977, ¶ 13-14. Further, Hughes and M.H. testified that their relationship ended almost immediately after the shooting, and they had not been romantically involved with each other for the nearly two-year period between the event and the trial. Thus, any claim that their romantic involvement affected their testimony could have reasonably been ignored by the jury. Also, the mere fact that two witnesses recalled different statements made by Watson during the course of the car ride following the shooting did not, in itself, render their testimony incredible. Indeed, one could infer that Watson described the shooting in different words throughout the course of the ride. Additionally, we cannot say that the fact that neither Hughes nor M.H. reported the crime and that they both initially denied involvement when questioned by the police rendered them unbelievable. Hughes testified he was afraid to report the incident because he feared retaliation, and M.H. testified she was afraid she would be in trouble if she admitted her involvement.

{¶ 33} Watson next claims the testimony provided by Whitner and M.H. was inherently incredible because they both had reached plea agreements with the State

requiring them to testify against him. Again, the jury was made aware of the plea agreements, both of which were admitted into evidence. The jury was also aware that the agreements were reached well after M.H. and Whitner had been interviewed by the police.[2]

**{¶ 34}** We cannot conclude that the jury clearly lost its way in choosing to believe the testimony of Hughes, M.H., and Whitner, as a trier of fact is free to believe all, some, or none of the testimony of each witness appearing before it. *Iler v. Wright*, 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25. Furthermore, there is nothing in this record that would cause us to conclude that M.H. or Whitner was improperly induced to testify.

**{¶ 35}** After reviewing the record before us, we conclude the State produced evidence sufficient to sustain the convictions and that the convictions were otherwise not against the manifest weight of the evidence. Accordingly, Watson's assignments of error are overruled.

### III.    Conclusion

**{¶ 36}** Both of Watson's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

---

[2] Watson asserts that the State agreed to permit M.H.'s case to remain in juvenile court, rather than pursuing a transfer to adult court, in exchange for her testimony against Watson. However, the record demonstrates that the juvenile court, against the wishes of the State, decided to retain jurisdiction over the case, and, a plea agreement was reached thereafter.

WELBAUM, J. and EPLEY, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Jeffrey T. Gramza
Hon. Richard Skelton