**[Cite as *State v. Dudley*, 2023-Ohio-543.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29528 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 00082 |
| | : | |
| DANIELLE DUDLEY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 24, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

ROBERT ALAN BRENNER, Attorney for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Danielle Dudley appeals her conviction for felonious assault following a jury trial. In support of her appeal, Dudley contends that her conviction was against the manifest weight of the evidence. For the following reasons,

we affirm the judgment of the trial court.

### I. Facts and Course of Proceedings

{¶ 2} On January 15, 2021, Dudley was charged by way of indictment on one count of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree, and one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree. Dudley entered not guilty pleas and the case proceeded to a jury trial beginning on May 9, 2022.

{¶ 3} At trial, the State presented testimony of several witnesses, including that of Walter Bell, the alleged victim. Bell testified that on January 6, 2021, he woke up and went to a friend's house around 10:30 or 11 a.m. When he arrived, Bell said hello to Dudley, who was already present drinking beer. Bell had been friends with Dudley for nearly 30 years and at some point had had a romantic relationship with her. While speaking with his mother, Bell accidentally spilled his beer on the floor. In an effort to clean up the mess, he got a mop and was rinsing it out at the sink in the kitchen when Dudley came behind him and threw a can at him but missed. Bell's friend told Dudley to leave, and she did.

{¶ 4} Later that day, Dudley called Bell and offered to make it up to him through dinner that night. Bell agreed, and the two went to the grocery store to get some food. After the grocery store, Dudley and Bell went to Dudley's house on Woodward Avenue in Dayton, Ohio. As Bell was helping to put the groceries away in the refrigerator, he turned around and Dudley stabbed him with a kitchen knife in his shoulder/collar bone. Dudley went to strike Bell a second time, but he was able to push her down. Shortly thereafter,

Dudley's adult son, Aaron Dudley, came downstairs.[1]   Dudley told Aaron to get a towel to put on Bell's bleeding shoulder.   At the time of the stabbing, Bell was wearing an army jacket.   The jacket had a tear in it from the knife and some of Bell's blood on it.

{¶ 5} Dudley offered to take Bell to the hospital, and they got in her Ford SUV to leave.   While in Dudley's car on the way to the hospital, Dudley threatened to kill them both.   She stepped hard on the gas and made it seem as though she was going to hit a tree or a pole.   When Dudley came to an abrupt stop, Bell jumped out of the car and called the police.   After he got out of the car, Dudley did a U-turn like she was looking for him but then drove off.

{¶ 6} An ambulance transported Bell to Miami Valley Hospital where he received stitches.   Although the stitches had been removed, Bell had a scar that was still present at the time of trial.

{¶ 7} Bell admitted that he had owed Dudley some money and tried to give her $100, but she refused, stating that she wanted full payment, not partial payment. However, Bell denied they had been arguing about the money when Dudley stabbed him or that they had fought over her purse that day.   He admitted to drinking some beer earlier in the day but denied that he had been intoxicated at the time of the stabbing.

{¶ 8} Dayton Police Officer Nathan Speelman testified about responding to Bell's 911 call around 5 p.m. on January 6, 2021.   When Ofc. Speelman located Bell at the intersection of Home and James H. McGee Boulevard, Bell was actively bleeding and requested medical attention.   Bell informed Ofc. Speelman that he had been stabbed by

---

[1] To prevent any confusion, Danielle Dudley will be referred to as "Dudley" throughout this decision and Aaron Dudley will be referred to as "Aaron."

Dudley at her home on Woodward Avenue and that, as she was taking him to the hospital, she had threatened to kill him, so he got out of the car. Bell did not appear intoxicated.

{¶ 9} Ofc. Speelman and a second officer responded to Dudley's home. After not receiving an answer at the front door, they went to the rear door of the home; they observed some blood on the door. After approximately a half-hour, Aaron Dudley arrived at the home and let the officers into the house. In the kitchen, Ofc. Speelman observed additional blood on the inside of the rear door as well as small blood droplets on the kitchen floor. A kitchen knife was found by the kitchen sink which was ultimately collected and identified by Bell as the knife used to stab him.

{¶ 10} Dudley was not present at the home while officers were there, and a broadcast was issued for her whereabouts. A couple of hours later, Dudley's vehicle was located near the Desoto Bass Apartments, and she was arrested. At the time of her arrest, she was intoxicated to the point that the officers did not attempt to interview her.

{¶ 11} Aaron Dudley testified on behalf of the State. Aaron lived with his mother, Dudley, on Woodward Avenue. He was familiar with Bell through his mother, who had had an "intimate relationship" with Bell, and Bell had been over to their house several times. According to Aaron, Bell and Dudley arrived home together on January 6, 2021. Aaron was upstairs in his bedroom when he heard arguing downstairs and then crashing noises and talking. When he came downstairs, he saw Bell and Dudley tussling over a purse and then saw blood on Bell. He gave Bell a washcloth to put on his injury, and then Bell and Dudley left the house to go to the hospital. After leaving for the hospital, Dudley returned to the house but left again before the police came.

{¶ 12} When the police arrived, Aaron told them that his mother had stabbed Bell and that she had been intoxicated. However, on cross-examination, he stated that he had not seen his mother stab Bell and he had assumed both Bell and Dudley were intoxicated, but he never saw them drinking. He did see alcohol in the house that day. When asked if he had spoken with his mother about the incident, he denied ever speaking with her about it. He also stated on cross-examination that although he heard arguing, he did not see or hear anything else.

{¶ 13} Katie Hewlett, a physician assistant at Miami Valley Hospital, treated Bell for the injury he received on January 6, 2021. She testified that Bell had several tests conducted in the emergency department to verify the extent of his injuries. In the end, he received some sutures and was released the same day. As part of his treatment, Bell's blood was collected and analyzed which showed a blood alcohol content of .147.

{¶ 14} Dayton Firefighter Paramedic Matthew Fox also testified for the State. He responded to the area of James H. McGee Boulevard and Home Avenue on the evening of January 6, 2021. He observed Bell with a one-to-two-inch puncture wound near his collarbone. Although there was blood, the bleeding was controlled. Bell was alert and oriented to his location and was able to inform them that he had been stabbed with a kitchen knife. Bell did not appear to be intoxicated according to Fox. Based on the location of the injury, the medics were concerned about the potential severity of it, because they could not determine the extent of any internal injuries. They transported Bell to the Miami Valley Hospital for further treatment.

{¶ 15} Dudley testified on her own behalf. Dudley stated that she had lived with

her adult son Aaron in the single-family home on Woodward Avenue since 2019. She had known Bell for over 30 years and used to have him watch her older son when she would go to the store. In return, Dudley would make food for him.

{¶ 16} According to Dudley, on the day of the incident, she went to the Desoto Bass Apartments to see a friend and saw Bell as she was walking out. Dudley stated she went to the store and then went home, when Bell called her. Dudley told Bell she was going to the grocery store so she could make chili, and he asked to go with her because he wanted her chili. Dudley picked Bell up and took him to the store with her. Dudley claimed that before going to the store, she stopped at a drive-thru so Bell could get some beer and she could get some cigarettes.

{¶ 17} After getting groceries, they went to Dudley's home and unloaded the groceries. As Bell was bringing in the groceries, they began discussing the money that Bell owed Dudley. Dudley had informed Bell that she was going to file a civil lawsuit against him the following week because he had not paid her back yet. Dudley told Bell he owed her $600 because of the extra fees, but he only wanted to pay her the money owed, not the extra fees. Dudley acknowledged Bell originally only owed $200, but because of the late fees, he now owed her $600. According to Dudley, part of the money was due to Bell's using her credit card without her knowledge, which he had agreed to pay back. According to Dudley, Bell attempted to grab her purse because the contract was in there showing that he owed her the money. However, she grabbed the purse first and there was a tussle over it. While Dudley was trying to prevent Bell from getting her purse, he suddenly said "ow" and stopped moving. Dudley testified she went to the

bathroom and then Bell came into the bathroom holding a towel to his shirt where there was blood. She told Bell to take his jacket off, and she put an ACE bandage on him before they left for the hospital. She also stated that she picked up "whatever had fallen out of the sink" that they had bumped into before leaving the house, but did not identify what that item was. Dudley denied stabbing Bell and stated she never saw the injury or knew how it happened.

{¶ 18} Dudley indicated her son Aaron was present in the home during the incident but did not see what happened. Contrary to Aaron's testimony, Dudley admitted that she had spoken with him about the incident over the phone.

{¶ 19} Although Dudley intended to take Bell to the hospital, during the car ride Bell threatened to say that had Dudley stabbed him if she refused to turn over the contract. In response, she slammed on the brakes and told him to get out of her car. After Bell got out of her car, Dudley made a U-turn and went back home before she realized that she needed to go back to the store and go to the bank. Dudley denied threatening to kill Bell or that she had tried to run him over with her car when she did a U-turn. She also denied being intoxicated when the police arrested her.

{¶ 20} During cross-examination, Dudley admitted that she wrote in a statement describing the incident that Bell had fallen into a sink of dirty dishes and got cut by something sharp. However, she claimed that she assumed that was how he got injured and did not know for sure how it happened. She did admit that Bell had not been injured before coming into her home and that he had never tried to harm her that day.

{¶ 21} At the close of the trial, Dudley was found guilty of felonious assault (deadly

weapon) and not guilty of felonious assault (serious physical harm). She was sentenced to community control sanctions not to exceed five years. Dudley timely appealed.

## II. Analysis

{¶ 22} In her sole assignment of error, Dudley contends that her conviction was against the manifest weight of the evidence. Primarily, Dudley alleges that the jury lost its way because her testimony was more credible than Bell's testimony. We disagree.

{¶ 23} " 'To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.' " *State v. Garrett*, Ohio Slip Opinion No. 2022-Ohio-4218, __ N.E.3d __, ¶ 136, quoting *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 168. "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12.

{¶ 24} A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14. "Because

the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Therefore, this court will not substitute its judgment for that of the trier of fact on the issue of witness credibility "unless it is patently apparent that the trier of fac[t] lost its way in arriving at its verdict." (Citation omitted.) *Wilson* at ¶ 17.

{¶ 25} Dudley was convicted of one count of felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2). Thus, the State was required to prove beyond a reasonable doubt that Dudley did knowingly cause or attempt to cause physical harm to Bell by means of a deadly weapon.

{¶ 26} Having thoroughly reviewed the entire record, and deferring to the jurors' decisions regarding whether and to what extent to credit the testimony of the witnesses, we cannot conclude that Dudley's conviction was against the manifest weight of the evidence. Bell testified that when he was in Dudley's kitchen, she stabbed him with a kitchen knife that was later recovered from her kitchen. Bell's testimony demonstrated that it was an intentional stabbing as she actually attempted to stab him a second time, but he was able to push her away. As a result of the stabbing, he received a one-to-two-inch-long puncture wound near his collar bone that was sufficiently deep to require

multiple stitches. Blood was found inside Dudley's kitchen, and the jacket Bell had been wearing at the time of the offense had a defect in the area where Bell had been stabbed along with his blood. Bell's testimony and his injuries were consistent with his statements to police and to the paramedics immediately after the incident.

{¶ 27} Dudley contends that Aaron's testimony corroborated her testimony and discredited Bell's version of events. However, his testimony was conflicting in itself. It was clear from Bell's, Dudley's, and Aaron's testimonies that Aaron had been upstairs and had not witnessed what had happened in the kitchen or how Bell had been injured. When police came to the house, he told officers that his mother had stabbed Bell and that she had been intoxicated. During cross-examination, he claimed that he had not actually seen his mother stab Bell and that he only believed she had been intoxicated because he saw beer cans in the living room. Likewise, Aaron testified at one point that when he came downstairs, he had seen Bell and Dudley tussling over her purse, but he later testified that other than hearing arguing, he did not see or hear anything else. He also denied talking to his mother about the incident, but during her testimony, she stated that she had in fact spoken to him about the incident and claimed he had been mistaken. Thus, while Aaron's testimony at times contradicted Bell's testimony, it also sometimes contradicted Dudley's testimony.

{¶ 28} Dudley's testimony corroborated that she picked Bell up and that they went to the store so that she could make chili for him that night. She admitted that Bell was uninjured prior to coming inside her home. Dudley confirmed that Bell had injured in her kitchen and that she had intended to take him to the hospital; however, she denied

knowing how he became injured. Dudley did provide a somewhat implausible explanation that when she and Bell were tussling over her purse, he managed to fall into the sink full of dirty dishes and utensils and something sharp in the sink caused the injury to his collarbone. However, the jury, as the trier of fact, was free to believe some, all, or none of a particular witness's testimony. *State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 39. In this case, the jury clearly believed Bell's version of events and disbelieved Dudley's version. Notably, all of the issues Dudley cited to in her appellate brief as being incredible were pointed out to the jury during the course of the trial; thus, we may presume the jury accounted for these matters as part of its evaluation of the credibility of the State's witnesses. *State v. Watson*, 2d Dist. Montgomery No. 28914, 2021-Ohio-2218, ¶ 32. Further, "[i]t has long been recognized that conflicting evidence and inconsistencies in testimony do not render a verdict against the manifest weight of the evidence." *Hunter v. Hunter*, 2d Dist. Montgomery No. 21285, 2006-Ohio-6307, ¶ 9. Upon reviewing the entire record, we find that the jury's resolution of the competing testimony and evidence was not against the manifest weight of the evidence. This is not an exceptional case in which the evidence weighed heavily against the conviction. Dudley's sole assignment of error is overruled.

### III. Conclusion

{¶ 29} Having overruled the sole assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and EPLEY, J., concur.